[This decision has been published in *Ohio Official Reports* at 93 Ohio St.3d 6.]

THE STATE OF OHIO, APPELLEE, *v*. NIELDS, APPELLANT.

[Cite as *State v. Nields*, 2001-Ohio-1291.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 98-20—Submitted April 25, 2001—Decided August 29, 2001.)

APPEAL from the Court of Common Pleas of Hamilton County, No. B9703305.

_____

LUNDBERG STRATTON, J.

{¶ 1} On the night of March 27, 1997, Patricia Newsome was found strangled on her kitchen floor. Police arrested Richard Nields, defendant-appellant, Newsome's frequent live-in companion, at Newsome's home that night, not long after Springfield Township Police had transported him there. Defendant was indicted for aggravated murder and aggravated robbery, found guilty as charged, and sentenced to death.

{¶ 2} Prior to 1997, defendant and Patricia Newsome had an on-again, off-again relationship for approximately ten to twelve years. In the year leading up to the murder, they lived together at Newsome's home in Finneytown, Springfield Township, in Hamilton County. Newsome worked as a realtor in Fairfield, and defendant was a keyboard musician who was out of work most of the time. On March 27, 1997, Newsome had lunch with her friend, Dorothy Kiser. Newsome told Kiser that she asked defendant to move out. Even though defendant had packed his clothes in his car in order to move out, "he kept coming back to the house."

{¶ 3} In the weeks leading up to March 27, defendant would call Newsome with hostile messages. On one occasion, an angry call for Newsome was received by the office receptionist, Floanna Ziegler, from a man identifying himself as a musician. Newsome wrote the incident down and told Ziegler, "I'm trying to file charges against him and I want to document everything that he said to you."

{¶ 4} During the afternoon of March 27, Dorothy Alvin had a conversation with defendant, who was a stranger to her, at Lulu's bar in Springfield Township. Defendant told Alvin that the lady whose house he lived in was throwing him out. Defendant further told Alvin, "I'd like to kill her, but I guess I won't do that because I don't want to go to prison."

{¶ 5} Later, during the evening of March 27, Barbara Beck and Patricia Denier were dining at the Briarwood Lounge on Hamilton Avenue. At approximately 10:30 p.m., defendant entered the bar and approached the two women, both of whom he knew. Both women noticed blood on his right hand and asked him what happened. Defendant said to them, "[Y]ou'll hear it on the news tomorrow." Defendant also kept repeating, "I'm in serious, serious trouble." Both women thought that he was in shock and was acting strange. Neither smelled any alcohol on his breath.

{¶ 6} As Beck and Denier left the lounge, defendant walked them to their car and asked to go with them. After they declined to take defendant with them, defendant told them, "I'm going to be driving home in a Cadillac." They saw defendant walk across the street to a white Cadillac. Friends of Patricia Newsome testified that she owned a white Cadillac but never let anyone else drive it, especially defendant, "because of the way he drank."

{¶ 7} Anthony Studenka was at DJ's Pub on Winton Road on the night of March 27, a little before midnight and sat down next to a person at the bar who "told me he killed somebody." That person was defendant. Defendant showed Studenka his hands, which had cuts on them, and told Studenka that he had killed some kid who was a drug pusher. Defendant then suddenly became belligerent and started calling Studenka insulting names. Kimberly Brooks, a friend of Studenka, also heard defendant declare that he had killed someone and noticed that defendant had "dried blood all over" his hands. However, defendant then denied that he had

killed anyone, and said that he had helped drag the body away. Brooks called 911 to report defendant's statements.

{¶ 8} Springfield Township Police Officer Greg Huber was in front of DJ's Pub when he heard a radio call that a male at the bar was bragging that he had killed someone. Huber encountered defendant inside the bar and asked him to step outside because of the noise. After initially refusing to do so, defendant went outside and spoke with Huber, who then noticed blood on both of defendant's hands. When asked about the blood, defendant told Huber that he was in a fight across the street at Lulu's bar. At that time, Police Sgt. Ken Volz arrived on the scene. Huber then went to Lulu's to investigate and discovered that there had been no fight there.

{¶ 9} Sgt. Volz and another officer, Clayton Smith, spoke with defendant outside of DJ's Pub. Defendant told the officers that the story of the killing he was telling inside the bar was really about a Clint Eastwood movie. Smith, who was familiar with such movies, asked defendant questions to find out to which movie defendant was referring. However, defendant could not sufficiently answer any of his questions. Sgt. Volz then instructed Smith to drive defendant home due to his "intoxication level."

{¶ 10} Defendant pointed to the white Cadillac across the way as "his girlfriend's car" that he drove, which Volz learned was registered to Patricia Newsome. Volz then went to Newsome's house on 8527 Pringle Avenue, "to check on [her] well being." When he peered through the front window, he could see that the television and some lights were on, and he could hear the dog barking inside.

{¶ 11} As Officer Smith drove up to the Pringle Avenue residence with defendant, Sgt. Volz was standing on the front porch area. Defendant "became very uptight and aggressive and verbal and almost yelling" at Smith. Defendant declared that they were not going into the house without a search warrant. Defendant eventually calmed down, and the officers let him enter the house and hoped he

would calm down for the night. However, after defendant entered the house, the officers could see defendant through the front window "waving his hands * * * in an erratic fashion."

{¶ 12} As the officers were leaving, they noticed the door on the attached garage was open. Officer Smith entered the open lit garage and peered in a window that looked into the kitchen. Smith saw "a female * * * on the ground [who] * * * was obviously deceased." The officers went to the front door and saw defendant through the front window still waving his arms. They knocked on the door, and as defendant opened the door, they grabbed his arm, pulled him outside, and handcuffed him. Police arrested defendant and advised him of his *Miranda* rights. Sgt. Volz entered the house to check on the victim but could not detect a pulse.

{¶ 13} While defendant was detained in the police cruiser, he kept asking Officer Smith, "[I]s she alive?" During the arrest, police found fifteen traveler's checks in defendant's possession, all of which bore Patricia Newsome's name. Police Chief David Heimpold arrived at the scene and readvised defendant of his *Miranda* rights. Defendant told Heimpold that he and Newsome had been in an argument. She hit him with the telephone, he then pushed her, and she hit her head on a bookcase. Defendant also mentioned that someone named "Bob" was also there, but shortly thereafter, he admitted that this was a lie. Defendant admitted that he had choked Newsome after they had had a fight. The assistant medical examiner, who performed the autopsy on Newsome, concluded that she had died from asphyxia due to manual strangulation.

{¶ 14} Defendant was incarcerated at the Hamilton County Justice Center. Two days after the murder, he talked with Timothy Griffis, who was serving time that weekend for nonpayment of child support. Defendant told Griffis that "he had killed his girlfriend," that they had argued, and that he "jumped on top of her, started beating her up." Defendant said that he then went to a bar. He came back to Newsome's home to see if she was breathing and started strangling her. He laid

4

the phone on top of Newsome's chest, called her either "bitch" or "baby," and told her, "Call me from heaven." According to Griffis, defendant at times appeared to be remorseful, but at other times, he exhibited a carefree attitude while recounting the details of the murder. Defendant also told Griffis that he took money, jewelry, and traveler's checks out of Newsome's purse. According to Griffis, defendant was kind of upset because he could not use the traveler's checks.

{¶ 15} On May 2, 1997, the grand jury indicted defendant for aggravated robbery, aggravated murder with prior calculation and design, and aggravated felony-murder during an aggravated robbery. A death penalty specification attached to the aggravated murder counts alleged that defendant had committed aggravated murder during the aggravated robbery and that he was either the principal offender or committed the aggravated murder with prior calculation and design. R.C. 2929.04(A)(7).

{¶ 16} Prior to trial, a suppression hearing was held on defendant's motion to suppress defendant's statement to police after he requested an attorney, his statements at DJ's Pub, and his statement to Timothy Griffis because the police entered the curtilage of Newsome's home without a warrant. The trial court denied the motion to suppress, holding that exigent circumstances justified the search of the home. The court further held that defendant's statements to police after he requested an attorney were freely and voluntarily given and that defendant's statement at the Justice Center to Griffis and his statements at the pub were not suppressible.

{¶ 17} The state called numerous witnesses to establish defendant's guilt before a jury. The defense conceded that defendant had killed Newsome but disputed that defendant had purposefully or "knowingly caused the death of Patricia Newsome" because he was "under the influence of sudden passion * * * and rage." During the trial, Officer Nancy Richter testified that she discovered three pages of yellow legal paper entitled "Record of Abuse" at Newsome's residence while she

and Newsome's children were looking for her will several days after the murder. A forensic document examiner with the coroner's office determined that the "Record of Abuse" pages were written by Newsome.

**{¶ 18}** Also at trial, Springfield Township Police Officer Paul Rook testified that he responded to a "domestic call" at Newsome's residence on March 1, 1997. At that time, Newsome told Rook that she wanted defendant to leave her home and that she was afraid of him. Rook and another officer took defendant from Newsome's residence until he could find someone else who would come and get him. The defense called one witness.

**{¶ 19}** After deliberation, the jury found defendant guilty as charged.

**{¶ 20}** At the mitigation hearing, the defense presented three witnesses: defendant's sister, Rochelle Pittman; Dr. Emmett Cooper, psychiatrist and pharmacologist; and Assistant Public Defender James Slattery. Pittman chronicled defendant's family life, including the fact that defendant's father was an alcoholic who left the family when defendant was in high school. Pittman also testified that she became friends with Newsome and that a few weeks before the murder, they discussed having defendant committed at Newsome's suggestion.

**{¶ 21}** Dr. Cooper testified that defendant was an alcoholic and reviewed the medical ailments that defendant suffered as a result of his alcoholism. Dr. Cooper observed that defendant's time in jail since his arrest represented his longest period of sustained sobriety since 1976. Slattery, an admitted alcoholic, testified as to the deleterious effects of alcohol and how his alcoholism interfered with his ability to do what was best for himself as well as his ability to practice law.

**{¶ 22}** The jury recommended death, and the court imposed the death sentence on defendant.

**{¶ 23}** The cause is now before this court upon an appeal as of right.

**{¶ 24}** In this appeal, defendant raises forty-four propositions of law for review. Upon review of each proposition of law, we find that none warrants

reversal of defendant's convictions or death sentence. We have also independently weighed the aggravating circumstance against the mitigating factors and compared his sentence to those imposed in similar cases, as R.C. 2929.05(A) requires. Having done so, we affirm defendant's convictions and sentence of death.

## VOIR DIRE/PRETRIAL ISSUES

### *Failure to Appoint or Fund Defense Experts*

{¶ 25} In propositions I, X, XI, XXXIII, and XXXVI, defendant contends that the court's failure to provide him with adequate funds for several expert witnesses prevented him from presenting an adequate defense, in violation of *Britt v. North Carolina* (1971), 404 U.S. 226, 92 S.Ct. 431, 30 L.Ed.2d 400, and *Ake v. Oklahoma* (1985), 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53.

{¶ 26} In proposition I, defendant complains that he was not provided with an investigator, a coroner, a crime scene investigator, or an expert on voice or audiotape. In proposition X, he claims error because the court failed to provide funds for an independent expert pathologist, and in XI, he argues that he was prejudiced by not having a neuropharmacologist. In proposition XXXIII, defendant claims error in the failure of the court to appoint or provide funds for an independent psychologist, since Dr. Cooper's testimony was limited to explaining defendant's alcoholism. In proposition XXXVI, defendant asserts error because he lacked an independent neuropsychologist for mitigation purposes.

{¶ 27} In *Ake v. Oklahoma*, 470 U.S. at 74, 105 S.Ct. at 1091-1092, 84 L.Ed.2d at 60, the United States Supreme Court held that due process requires that an indigent defendant have access to psychiatric assistance "when [the] defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial." Further, R.C. 2929.024 requires trial judges to grant funds in aggravated murder cases for investigative services and experts when "reasonably necessary for the proper representation" of indigent defendants.

{¶ 28} In *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932, syllabus, we recognized that due process, as protected by constitutional guarantees, "requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." See, also, *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus; Sup.R. 20(IV)(D).

{¶ 29} We find that all of defendant's arguments lack merit. First, the record demonstrates that the trial court allocated funds for expert assistance when defendant requested such funds. For example, the trial court allocated funds for a mitigation specialist and a clinical psychiatrist to examine defendant and review his medical history.

{¶ 30} Second, defendant never requested funds for an investigator, a coroner, a crime-scene investigator, an expert on voice or audiotape, an expert pathologist, a neuropharmacologist, an independent psychologist, or an independent neuropsychologist. We "need not consider an error" when the complaining party "could have called, but did not call" the matter to the trial court's attention. *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus. Since plain error is absent, all of defendant's propositions of law in this realm are devoid of merit on that ground alone.

{¶ 31} In proposition I, defendant asserts generally that the defense was hamstrung by a lack of funds, but fails to explain how an investigator, a coroner, a

crime scene investigator, or an expert on voice or audiotape would have helped his defense. Defendant's defense was that although he killed Newsome, it was the result of passion or rage. Yet, defendant does not explain how these experts would have aided such a defense. Thus defendant failed to show a particularized need for these experts and has not shown how the failure to employ these experts denied him a fair trial. Cf. *Mason*, 82 Ohio St.3d at 152, 694 N.E.2d at 945; *State v. Clemons* (1998), 82 Ohio St.3d 438, 443, 696 N.E.2d 1009, 1015.

{¶ 32} Furthermore, the record does not support defendant's arguments in proposition X that an independent pathologist would have helped defendant. The coroner examined the victim and thoroughly documented and photographed the autopsy. The record indicates that the autopsy was performed in a competent and professional manner. The cause of death was not an issue here, and defendant has not established a particularized need or shown how the lack of another pathologist resulted in an unfair trial.

{¶ 33} In propositions XI, XXXIII, and XXXVI, defendant claims that the court's failure to appoint a neuropharmacologist, independent psychologist, and neuropsychologist prevented available, relevant mitigating evidence from being introduced. However, this claim also lacks merit. Defendant employed a mitigation specialist and a psychiatrist, Dr. Emmett Cooper, who also possesses a doctorate in pharmacology. Dr. Cooper discussed the effects that alcohol had on defendant and the physical damage he has suffered as a result of his alcoholism. Thus, counsel readily had "alternative devices that would fulfill the same functions as the expert assistance sought." *Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph four of the syllabus. Defense counsel at trial never suggested that they needed further assistance from a neuropharmacologist, an independent psychologist, or a neuropsychologist. Thus, no "particularized showing" was made.

**{¶ 34}** Moreover, defendant has not shown that the lack of such experts caused an unfair trial. Cf. *State v. Coleman* (1989), 45 Ohio St.3d 298, 304, 544 N.E.2d 622, 630. Based on all the foregoing, we reject defendant's propositions I, X, XI, XXXIII, and XXXVI.

*Suppression Issues*

**{¶ 35}** Propositions VII and XIX involve issues raised at the suppression hearing conducted prior to trial.

**{¶ 36}** *Confession*. In proposition VII, defendant asserts that two statements he made to police should have been suppressed: (1) the statements he made to Springfield Township Police Chief Heimpold shortly after his arrest outside Newsome's home, and (2) the statement he gave at the police station that was tape recorded after he had requested an attorney.

**{¶ 37}** During the suppression hearing, Chief Heimpold testified that he read defendant his *Miranda* rights outside Newsome's home, even though Officer Smith had already done so moments earlier. Defendant stated that he understood his rights. Defendant told Heimpold that he had come home and argued with Newsome while another person was in the house. She struck him with a telephone, and he pushed her, causing her to hit her head on the bookcase. When Heimpold asked who else was in Newsome's home at the time, defendant admitted that he lied about someone else being there. Heimpold noted that he had seen the victim and noticed bruising on her neck. When Heimpold asked defendant if he had choked Newsome, he responded that he had. Heimpold then transported defendant to the police station. In this conversation, defendant never asked for an attorney and displayed no hesitation in talking with police.

**{¶ 38}** At the police station, a tape recorder was set up, and police again advised defendant of his *Miranda* rights. Heimpold began interviewing defendant with Detective Pat Kemper also present. After the interview began, defendant requested an attorney, and he turned off the tape recorder himself at 1:06 a.m.

Unbeknownst to defendant, another tape recorder automatically turned on. At that point, Heimpold told defendant that he was going to charge him with murder. Other officers began processing defendant to find out his name, address, and phone number, but they did not ask him about the murder.

{¶ 39} Defendant then began to try to explain to Heimpold what happened that night, and Heimpold told him that he could not hear it without defendant's attorney present. Defendant said, "[N]o, I want to tell you what happened." At 1:25 a.m., with three other officers present, Heimpold restarted the tape recorder, and defendant acknowledged that he wanted to talk to the officers about what happened at Newsome's house. Defendant then read aloud his *Miranda* rights and signed a waiver-of-rights form. During the interview, defendant was given bathroom breaks and was provided cigarettes and soft drinks. Heimpold testified that defendant began to cry a little bit when he said that he killed Newsome. The trial court ruled that defendant's incriminating statements to the police were freely and voluntarily given, essentially finding that they were not given in response to police questions.

{¶ 40} The transcript indicates that police advised defendant of his *Miranda* rights at least four times. When defendant decided that he wanted to talk with police on his own initiative and no longer wanted an attorney, he signed a waiver-of-rights form. The evidence supports the trial court's finding that defendant was properly advised of his *Miranda* rights and that he understood those rights when he signed the waiver. An accused's signed waiver form is strong proof that such waiver was valid. *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854; *North Carolina v. Butler* (1979), 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286, 292.

{¶ 41} The evidence shows that it was defendant who initiated the conversation about the murder during routine police processing at the station. When Heimpold told defendant that he could not hear anything without his attorney

present, defendant insisted on "tell[ing Heimpold] what happened." Therefore, it is clear that defendant's statements to police after he invoked his right to have an attorney present were initiated by him, were not the result of a police interrogation, and were voluntary and not elicited in violation of his constitutional rights. See *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 1045-1046, 103 S.Ct. 2830, 2834-2835, 77 L.Ed.2d 405, 410, construing *Edwards v. Arizona* (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378; *State v. Jones* (2000), 90 Ohio St.3d 403, 413, 739 N.E.2d 300, 313.

**{¶ 42}** At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 982, citing *State v. Fanning* (1982), 1 Ohio St.3d 19, 20, 1 OBR 57, 58, 437 N.E.2d 583, 584. See, also, *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus; *State v. DePew* (1988), 38 Ohio St.3d 275, 277, 528 N.E.2d 542, 547. Nothing suggests that defendant's "will was overborne" or that his "capacity for self-determination was critically impaired because of coercive police conduct." *State v. Otte* (1996), 74 Ohio St.3d 555, 562, 660 N.E.2d 711, 719; *Colorado v. Connelly* (1986), 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484. See, also, *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus (in deciding whether confession was involuntary, court should consider totality of circumstances).

**{¶ 43}** Under the totality of the circumstances, we find that defendant made a knowing, voluntary, and intelligent waiver of his constitutional rights and that he initiated the conversation with police about the murder, after having previously invoked his right to have an attorney present. Finally, any error in failing to suppress defendant's statement at the police station was harmless beyond a reasonable doubt. At the police station, defendant merely repeated what he had

already admitted to Heimpold at the time of his arrest outside of Newsome's home. Accordingly, we overrule proposition VII.

*Warrantless Search of Residence and Automobile*

{¶ 44} In proposition XIX, defendant contends generally that the police improperly searched his person, vehicle, and residence on the night of his arrest and the following week. The trial court held at the conclusion of the suppression hearing that there were exigent circumstances validating the warrantless search of Newsome's home.

{¶ 45} *Residence*. A warrantless entry into a home to make a search or arrest is *per se* unreasonable, and the burden of persuasion is on the state to show the validity of the search. *State v. Kessler* (1978), 53 Ohio St.2d 204, 207, 7 O.O.3d 375, 377, 373 N.E.2d 1252, 1255; *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 218, 524 N.E.2d 889, 891-892. There is no "murder scene exception" to the warrant requirement. *Mincey v. Arizona* (1978), 437 U.S. 385, 395, 98 S.Ct. 2408, 2415, 57 L.Ed.2d 290, 302; *Thompson v. Louisiana* (1984), 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246. "Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin* (1984), 466 U.S. 740, 750, 104 S.Ct. 2091, 2098, 80 L.Ed.2d 732, 743; see, also, *Payton v. New York* (1980), 445 U.S. 573, 585-587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639, 651, fn. 25.

{¶ 46} A review of the facts and circumstances leading up to the entry and search of Newsome's home indicates that the trial court was correct in upholding the warrantless search. Springfield Township police officers were notified that defendant had been telling bar patrons at DJ's Pub that he killed someone or was present during a murder. Defendant had blood on both of his hands when police arrived at the pub, and another officer discovered that his alibi claiming that he got bloody hands from a fight at a bar across the street was false. Defendant also falsely

explained that when he told bar patrons that he killed someone, he was actually recounting a Clint Eastwood movie. The police decided to take defendant home because he was "highly intoxicated" and they did not want him driving any vehicle home. They were also concerned because, after running a check on defendant and on Newsome's car, they discovered that defendant had a history of domestic violence and that his explanations for his bloody hands were inconsistent or false.

{¶ 47} Upon arriving at Newsome's home, defendant became very hostile with the police, yelling and ranting that they had to have a search warrant to enter the residence. The officers allowed defendant to enter the house alone. Then, for about thirty to forty seconds, they could see defendant through the window, and he was "just standing in one place ranting and raving and just flailing his arms." The officers could not understand why defendant was so upset and, in spite of defendant's unusual behavior, were considering leaving the home, even though "something wasn't right."

{¶ 48} At that time, Officer Smith noticed that the garage door was open and saw a window in the garage next to a door that emitted light from inside the house. Smith went into the garage, got on a step leading to a door into the house, and looked into the kitchen area through the window. He saw a white female lying on the kitchen floor with a pool of blood around her head. The officers then immediately went to the front door and knocked. Defendant answered, and the officers grabbed his arm, pulled him outside, and placed him under arrest. Because they did not know if there were more people in the house, and having seen the victim lying on the floor, the officers went into the house to check on the victim and to see if anyone else was in danger.

{¶ 49} We find that both exigent circumstances and probable cause permitted the warrantless entry and search of the victim's home. Officer Smith's initial warrantless entry into the garage was permissible under the exigent circumstances exception to the Fourth Amendment warrant requirement because

14

defendant's behavior and statements leading up to his arrest compelled an immediate, and therefore warrantless, investigation into whether any victims of the crime were on the premises. "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona,* 437 U.S. at 391, 98 S.Ct. at 2413, 57 L.Ed.2d at 300. At the time Smith entered Newsome's garage and peered in the kitchen window, *yet before seeing Newsome's corpse,* he quite reasonably believed that someone within the residence was in need of immediate assistance.

{¶ 50} The third officer to arrive at DJ's pub, Smith was aware that defendant had bragged to bar patrons about killing someone. Due to his own familiarity with Clint Eastwood films, Smith had reason to doubt defendant's purported justification for the story. Another officer at the scene had learned that defendant had a prior conviction for domestic violence. Smith personally observed fresh wounds and blood on defendant's hands, defendant's "out of control" behavior outside Newsome's residence, and defendant's bizarre "flailing" just inside the house. From a position outside the garage, Smith could see through the interior garage window into Newsome's kitchen above sink level. Though he saw no evidence of a crime from that vantage point, Smith acted reasonably in entering the garage "to make sure that there was nobody else in there," and the circumstances justified the officers' warrantless entry into the residence to check the victim's status and to ascertain whether anyone else was in danger. *Mincey,* 437 U.S. at 392, 98 S.Ct. at 2413, 57 L.Ed.2d at 300, citing *Michigan v. Tyler* (1978), 436 U.S. 499, 509-510, 98 S.Ct. 1942, 1950-1951, 56 L.Ed.2d 486, 498.

{¶ 51} *Person.* Defendant also complains that he was illegally searched without a warrant. Yet, the facts indicate that the search of his person was proper as incident to a valid arrest. *United States v. Robinson* (1973), 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427, 440-441.

**{¶ 52}** *Inventory of Defendant's Automobile.* Lastly, defendant claims that the inventory and search of his own automobile (not Newsome's Cadillac) was illegal. However, defendant has waived this issue by failing to raise it before the trial court. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus.

**{¶ 53}** A warrantless inventory search of a motor vehicle is generally reasonable and lawful in most instances, depending on the particular facts of the search. *South Dakota v. Opperman* (1976), 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000. In Ohio, a standard inventory search of a lawfully impounded automobile, as was the situation here, is permissible. *State v. Robinson* (1979), 58 Ohio St.2d 478, 12 O.O.3d 394, 391 N.E.2d 317, syllabus.

**{¶ 54}** Here, defendant's automobile was properly impounded, and the inventory search of his automobile was undertaken in accordance with the procedures established by the Springfield Township Police Department. Once the officers who conducted the inventory search came across what appeared to be incriminating evidence in a box in defendant's vehicle, they stopped their inventory, sealed the car and sought a search warrant for defendant's automobile. Plain error is absent under the circumstances.

**{¶ 55}** Based on all the foregoing, we overrule proposition XIX.

*Denial of Bond*

{¶ 56} In proposition XII, defendant argues that he was deprived of a "reasonable bond" in violation of his constitutional rights.

{¶ 57} Section 9, Article I of the Ohio Constitution provides, "All persons shall be bailable by sufficient sureties, except for a person who is charged with a capital offense where the proof is evident or the presumption great." Defendant asserts error because no evidentiary hearing was held to determine if the proof was evident or if the presumption was great.

{¶ 58} When defendant was arraigned on May 6, 1997, he asked the court to set a reasonable bond. However, the prosecutor argued against any bond because of the capital charges and the fact that defendant had no regular job and was living at different residences, none of which were in his name. The trial court rejected the bond request because it was a capital case.

{¶ 59} In our view, defendant's complaint that he was unfairly denied bond lacks merit for several reasons. First, defendant never requested a hearing to determine whether "the proof is evident or the presumption great." Trial courts can "determine, before trial on the merits, the application of a person [charged with a capital offense] to be admitted to bail." *State ex rel. Reams v. Stuart* (1933), 127 Ohio St. 314, 188 N.E. 393, syllabus. Having failed to request a bond hearing, defendant waived the issue. See, *e.g.*, *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus; Crim.R. 12(G).

{¶ 60} Second, the jury subsequently convicted defendant of the murders largely on the basis of the evidence available by the date of his arraignment, which was more than a month after the crime. Therefore, the proof was "evident" at that time and the presumption "great." Even if a hearing had been held, no bail could reasonably have been expected to result.

{¶ 61} Third, defendant was indigent and could not have made any reasonable bond that would have been appropriate. If an accused is charged with

serious crimes and is facing a lengthy sentence, "the incentive to abscond is greater and the amount must be such as to discourage the accused from absconding." *Bland v. Holden* (1970), 21 Ohio St.2d 238, 239, 50 O.O.2d 477, 257 N.E.2d 397, 398.

**{¶ 62}** Finally, defendant has not demonstrated how his failure to be released on bail could have reasonably affected the result of his trial. "After conviction, any error concerning the issue of pretrial bail is moot." *State v. Patterson* (1996), 110 Ohio App.3d 264, 271, 673 N.E.2d 1001, 1006. Proposition XII lacks merit.

*Grand Jury Issues*

**{¶ 63}** In proposition XIII, defendant contends that he was indicted "by an improperly constituted grand jury and upon inadequately presented evidence" in violation of his constitutional rights.

**{¶ 64}** However, defendant's argument lacks merit for several reasons. First, he waived this issue by failing to raise it before the trial court. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. See, *e.g.*, *State v. Joseph* (1995), 73 Ohio St.3d 450, 455, 653 N.E.2d 285, 291 (challenge to indictment waived not having been made before or during trial).

**{¶ 65}** Second, the record does not reflect what evidence was presented before the grand jury; hence, whether the indictment was based on "inadequately presented evidence" cannot be evaluated. Moreover, "[a] reviewing court cannot add matter to the record before it * * * and then decide the appeal on the basis of the new matter." *State v. Ishmail* (1978), 54 Ohio St.2d 402, 8 O.O.3d 405, 377 N.E.2d 500, paragraph one of the syllabus. Additionally, an accused cannot attack an indictment valid on its face on the ground that the grand jury lacked sufficient credible evidence to indict. See *State v. Davis* (1988), 38 Ohio St.3d 361, 365, 528 N.E.2d 925, 929.

**{¶ 66}** Third, the record reflects no basis to find that the grand jury was "improperly constituted." Defendant claims (without benefit of record evidence)

18

that Hamilton County uses only voter registration lists to select grand jurors. Further, defendant argues (again without evidence) that when he was tried, "the percentages of African-American and other minorities registered to vote in Hamilton County was *less than the percentage* of racial minorities composing the voting age population of Hamilton County." (Emphasis added.)

{¶ 67} Fourth, even if defendant's assertions were proved as facts, those facts provide no basis for relief. As we noted in *State v. Williams* (1997), 79 Ohio St.3d 1, 17, 679 N.E.2d 646, 660, "Equal protection forbids intentional discrimination against any distinct group in choosing grand juries. * * * However, not every grand jury has to represent a 'fair cross-section,' so long as the selection process is nondiscriminatory." In *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, paragraph one of the syllabus, we held that in order to obtain standing to challenge a grand jury array on the basis of equal protection, "a defendant must prove that the procedure employed in the selection process resulted *in a substantial underrepresentation* of his or her race or of the identifiable group to which he or she belongs," and the group is recognizable and distinct. (Emphasis added.) Defendant fails to claim purposeful discrimination or substantial underrepresentation.

{¶ 68} Last, the use of voter registration lists to provide petit jurors is constitutional, and no basis exists to apply a different principle to the selection of grand jurors. See, *e.g.*, *State v. Moore* (1998), 81 Ohio St.3d 22, 28, 689 N.E.2d 1, 9; *State v. Johnson* (1972), 31 Ohio St.2d 106, 60 O.O.2d 85, 285 N.E.2d 751, paragraph two of the syllabus.

{¶ 69} *Grand Jury Foreman.* In proposition XXXIV, defendant contends that the "process used in Hamilton County to select foremen of grand juries that return capital indictments is biased geographically, racially, culturally, and socio-economically."

**{¶ 70}** However, defendant's claim fails for several reasons. First, defendant never raised his claim at trial and thus waived the issue. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus. Second, the record contains no evidence about how grand jury foremen were selected in Hamilton County, and thus no facts exist on which to claim error. Third, defendant claims that the process to select the foremen is biased "geographically, * * * culturally, and socio-economically," but he cites no authority that such claims are cognizable in constitutional law. Claims as to racial discrimination in the selection of grand jury foremen are cognizable, but defendant cites no statistical or other basis to believe that such discrimination occurred in Hamilton County. See *Rose v. Mitchell* (1979), 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739. Therefore, we reject proposition XXXIV.

*Prejudicial Publicity*

**{¶ 71}** In proposition XIV, defendant argues that prejudicial publicity that "occurred throughout [his] trial, deprived him of his right to a fair trial and a fair and reliable sentencing determination."

**{¶ 72}** Defendant's claim here fails for several reasons. First, defendant never requested a change of venue and never objected either before or during trial about prejudicial publicity. Defendant waived his right to complain on this basis. *State v. Campbell* (2000), 90 Ohio St.3d 320, 336, 738 N.E.2d 1178, 1197; *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. Second, defendant makes sweeping assertions about media coverage but cites no direct evidence of media interest, articles, or commentary on the trial. Without providing this court with specific evidence of excessive publicity, defendant cannot claim prejudice.

**{¶ 73}** Last, the trial court asked jurors about pretrial publicity during voir dire, and no juror indicated an inability to evaluate the evidence fairly. Thus, the record fails to support defendant's claim that prejudicial publicity deprived him of a fair trial or a fair sentencing determination. Proposition XIV is overruled.

*Voir Dire Issues*

{¶ 74} In proposition XXVI, defendant argues that the court failed to excuse two prospective jurors for cause because they made statements to the effect that they would automatically favor the death penalty. Defendant asserts that he was forced to exercise peremptory challenges on "automatic death penalty jurors." In proposition XXVII, defendant contends that four jurors were improperly excused for cause.

{¶ 75} Trial courts have discretion in determining a juror's ability to be impartial. *State v. Williams* (1983), 6 Ohio St.3d 281, 288, 6 OBR 345, 351, 452 N.E.2d 1323, 1331. R.C. 2313.42(J) contemplates that "good cause" exists for removal of a prospective juror when "he discloses by his answers that he cannot be a fair and impartial juror or will not follow the law as given to him by the court." A prospective juror who has been challenged for cause should be excused "if the court has any doubt as to the juror's being entirely unbiased." R.C. 2313.43. See *State v. Allard* (1996), 75 Ohio St.3d 482, 495, 663 N.E.2d 1277, 1289. However, a "ruling on a challenge for cause will not be disturbed on appeal unless it is manifestly arbitrary * * * so as to constitute an abuse of discretion." *State v. Tyler* (1990), 50 Ohio St.3d 24, 31, 553 N.E.2d 576, 587. Accord *Williams,* 79 Ohio St.3d at 8, 679 N.E.2d at 654.

{¶ 76} The two jurors defendant claims should have been excused for cause were prospective jurors Hoendorf and Adams. Hoendorf expressed fears that someone sentenced to twenty-five years in prison or to life in prison might not serve the full term. Adams indicated that the death penalty removed a murderer from society, that it was a deterrent, and that he favored capital punishment. However, both jurors agreed that they would consider sentencing options other than the death penalty. Adams agreed that he could impose a life-without-parole sentence. After the defense preserved a challenge to Hoendorf for cause, the trial judge questioned Hoendorf further. In response to the judge's inquiry, Hoendorf acknowledged that

he would set aside his expressed preconceived notions and assume that the sentence eventually imposed would in fact be fulfilled.

{¶ 77} Under these circumstances, the trial court did not abuse its discretion in failing to excuse either prospective juror for cause. "[D]eference must be paid to the trial judge who sees and hears the juror." *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 853, 83 L.Ed.2d 841, 853. Therefore, we overrule proposition XXVI.

{¶ 78} In proposition XXVII, defendant contends that prospective jurors Barnes, Johnson, Burgdorf, and Burnett were all improperly excused for cause. We find that defendant's assertions lack merit.

{¶ 79} Prospective juror Barnes stated, "I don't think I'm the one to pronounce sentence on someone's life. * * * I have a problem with the death sentence, period." Moreover, Barnes indicated to the trial judge that he would not follow his instructions of law. Even after defense counsel attempted to rehabilitate him, Barnes declared, "I couldn't pronounce him sentenced to death."

{¶ 80} Prospective juror Johnson also stated she could not consider imposing a death sentence if appropriate: "No, I will not." She described her position against the death penalty as a "permanent conclusion."

{¶ 81} Prospective juror Burgdorf expressed sentiments of being unable to vote in favor of a death sentence. While Burgdorf thought he could consider imposing a death sentence for multiple murderers such as Timothy McVeigh or Ted Bundy, he told the trial judge, "To be honest I don't think I could" when asked if he could fairly consider imposing a death sentence.

{¶ 82} Prospective alternate juror Burnett stated, "I could never sign anything if I knew the [defendant] was an alcoholic." Burnett further declared that he "couldn't do it [impose a death sentence] * * * under any circumstances."

{¶ 83} Given the responses of all four prospective jurors, the trial court did not abuse its discretion by excusing these jurors. Their views on the death penalty

would have prevented or substantially impaired their performance as jurors. See, *e.g.*, *State v. Dunlap* (1995), 73 Ohio St.3d 308, 315, 652 N.E.2d 988, 995; *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus. Accordingly, we reject proposition XXVII.

## TRIAL ISSUES

### *Prior Bad Acts*

{¶ 84} In proposition II, defendant asserts that the prosecutor impermissibly introduced "prior bad acts" testimony against him. Specifically, defendant complains that the prosecution elicited testimony from a police officer who had responded to a domestic violence call involving defendant and Newsome at her home several weeks before the murder. The trial court permitted evidence of the prior act because it showed a strained relationship between the killer and victim.

{¶ 85} Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove" a defendant's character as to criminal propensity. "It may, however, be admissible [to show] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶ 86} Here, the evidence defendant complains about tended to show his motive to murder Newsome. See *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus. The evidence also illustrated the tumultuous relationship between defendant and Newsome in an incident that took place just weeks before the murder. It also tended to prove the absence of accident and was evidence suggesting intent. The evidence showed defendant's strained relationship with Newsome within a month of the murder. See *State v. Wilson* (1996), 74 Ohio St.3d 381, 390, 659 N.E.2d 292, 303. Given these circumstances, we overrule proposition II.

### *Jury Instructions*

{¶ 87} In proposition V, defendant asserts that the jury should have been allowed to consider his intoxication on the night of the murder and that the trial

court erred in failing to charge the jury on the defense of voluntary intoxication. However, the trial court has discretion to determine whether the evidence is sufficient to require a jury instruction on intoxication. *State v. Wolons* (1989), 44 Ohio St.3d 64, 541 N.E.2d 443, paragraph two of the syllabus. Here, the court did not abuse its discretion in refusing to charge the jury on intoxication.

{¶ 88} During the afternoon, just hours prior to the murder, defendant was at Lulu's bar and mentioned to Dorothy Alvin, a bar patron at the time, that he would "like to kill" the woman he lived with, but did not want to go to prison. At that time, defendant "didn't really appear to be intoxicated" to Alvin. When Barbara Beck and Patricia Denier noticed defendant's bloody hands on the night of the murder, he did not seem to have been drinking or to have been intoxicated. Anthony Studenka, a patron at DJ's Pub who had an encounter with defendant on the night of the murder, testified that defendant did not seem "buzzed"; Studenka noticed no slurred speech or bloodshot eyes.

{¶ 89} In contrast, the two police officers who encountered defendant at the bar would not allow him to drive home because he appeared to be intoxicated. However, the fact the officers felt that defendant appeared to be intoxicated does not mean that the trial court abused its discretion in refusing to instruct on intoxication. Defendant's recall of the murder appears to have been clear when he saw Beck and Denier at the Briarwood Lounge and told them that they would hear about it on the next day's news. It was also clear to him two days after the murder when he recounted the crimes he committed to fellow inmate Timothy Griffis.

{¶ 90} Under these circumstances, we find that the trial court did not act arbitrarily or unreasonably in refusing to instruct the jury on intoxication. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149 (defining "abuse of discretion"); *Wolons*, 44 Ohio St.3d at 68-69, 541 N.E.2d at 446-447. Accordingly, we reject proposition V.

{¶ 91} We summarily reject defendant's complaint in proposition XVIII, that the statutory definition of reasonable doubt (R.C. 2901.05[D]) is constitutionally defective. We have uniformly upheld use of the statutory definition of reasonable doubt in jury instructions. See, *e.g., Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus; *Moore,* 81 Ohio St.3d at 37, 689 N.E.2d at 15. Accordingly, we hold proposition XVIII to be without merit.

{¶ 92} In proposition XXXIX, defendant asserts instructional errors during voir dire and the guilt phase. However, defendant failed to object to any of these alleged errors and therefore has waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

{¶ 93} Defendant first contends that the prosecution confused the venire during voir dire as to what they were to consider as the law. However, the transcript reveals that the prosecution did state that the "final word on the law" comes from the trial judge. Plain error is absent.

{¶ 94} Defendant next complains that the trial court improperly defined "reasonable doubt" at the close of the trial phase. Yet, as discussed above, the court's use of the R.C. 2901.05(D) definition of "reasonable doubt" was proper. See *State v. Frazier* (1995), 73 Ohio St.3d 323, 330, 652 N.E.2d 1000, 1008. Defendant's argument that the court erroneously instructed the jury on inferences, was not outcome-determinative. In view of the entire charge to the jury, see *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus, defendant was not prejudiced by the court's instructions on inferences. Nor did the court's failure to define the "theft" element of the aggravated robbery charge constitute plain error.

{¶ 95} Defendant claims error in the court's failure to distinguish murder from felony murder after having distinguished murder from aggravated murder with prior calculation and design in its jury instructions. The error, if any, was

harmless at worst. The jury found that a robbery had taken place when it convicted defendant on the aggravated robbery count. Thus, the jury would have convicted defendant of felony murder even if it had been properly instructed on the lesser included offense of murder. See *State v. Allen* (1995), 73 Ohio St.3d 626, 637, 653 N.E.2d 675, 686-687.

**{¶ 96}** Defendant raises several other instructional issues, but none of them have any merit. Based on all of the foregoing, we overrule proposition XXXIX.

*Sufficiency/Manifest Weight of the Evidence*

**{¶ 97}** In proposition VIII, defendant asserts that reversal of a conviction is warranted where the conviction is supported by insufficient evidence and is contrary to the manifest weight of the evidence. However, defendant does not argue why the evidence in this case is insufficient or suggest why his conviction is against the manifest weight of the evidence.

**{¶ 98}** In reviewing a record for sufficiency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *DeHass*, 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus.

**{¶ 99}** Here, the evidence is sufficient to establish defendant's guilt of the crimes for which he was convicted. On the day of the murder, defendant told Dorothy Alvin, a complete stranger, that the woman whose house he lived in was throwing him out and that "I'd like to kill her, but I guess I won't do that because I don't want to go to prison." Friends of the victim, Patricia Newsome, testified that she and defendant had a stormy relationship and that Newsome was documenting defendant's abuse of her in order to file charges against him.

**{¶ 100}** Barbara Beck and Patricia Denier saw defendant at the Briarwood Lounge on the night of the murder with bloody hands. He told both women that they would hear about what he did on the news the next day. Defendant later went to another bar where he told Anthony Studenka that he had killed somebody. He also made similar statements to Kimberly Brooks, who noticed dried blood all over his hands. Police officers who saw defendant at the bar that night also noticed blood on defendant's hands. Defendant had driven Newsome's Cadillac to the bars on the night of the murder although Newsome would never let anyone drive her car, especially defendant, "because of the way he drank."

**{¶ 101}** When police officers took defendant to Newsome's home, he acted erratically, flailing his arms while standing inside the front room of the house where he could be observed through the front window. Police thereafter discovered Newsome's body on the kitchen floor of her home. Defendant admitted to Police Chief Heimpold after his arrest that he and Newsome had argued and that he choked her.

**{¶ 102}** While in jail the day after the murder, defendant told fellow inmate, Timothy Griffis, that he had killed his girlfriend. Defendant also recounted to Griffis what he had done before and after he killed Newsome. He further told Griffis that he took money, traveler's checks, and jewelry from Newsome's purse that night.

**{¶ 103}** In addition, the coroner ruled that Newsome died of asphyxia brought on by manual strangulation.

**{¶ 104}** As to the manifest weight of the evidence, the issue is whether "there is *substantial* evidence upon which a jury could reasonably conclude that all the elements have been proved beyond a reasonable doubt." (Emphasis *sic*.) *State v. Getsy* (1998), 84 Ohio St.3d 180, 193-194, 702 N.E.2d 866, 882, citing *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus. The evidence referenced represents "substantial evidence" and supports the convictions.

The jury did not lose its way, and this is not " 'the exceptional case in which the evidence weighs heavily against conviction.' " *State v. Lindsey* (2000), 87 Ohio St.3d 479, 483, 721 N.E.2d 995, 1002, quoting *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, 547.

{¶ 105} Therefore, we find that proposition VIII lacks merit.

*Gruesome and Prejudicial Photographs*

{¶ 106} In proposition XV, defendant claims that he was prejudiced by the admission of several crime scene and autopsy photos of the victim that were gruesome and cumulative. Defendant also complains about the admission of an enlarged photo of himself taken shortly after his arrest.

{¶ 107} Under Evid.R. 403 and 611(A), the admission of photographs is left to a trial court's sound discretion. *State v. Landrum* (1990), 53 Ohio St.3d 107, 121, 559 N.E.2d 710, 726; *State v. Maurer* (1984), 15 Ohio St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791. Nonrepetitive photographs in capital cases, even if gruesome, are admissible if the probative value of each photograph outweighs the danger of material prejudice to the accused. *Id.,* paragraph seven of the syllabus; *State v. Morales* (1987), 32 Ohio St.3d 252, 258, 513 N.E.2d 267, 273-274.

{¶ 108} However, defendant did not object to the admission of crime scene and autopsy photographs marked State Exhibits 3-A, 3-B, 3-C, 4-A, and 4-G. Therefore, he has waived all but plain error as to these photographs. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

{¶ 109} Moreover, the trial court did not abuse its discretion in admitting any of the nine crime scene or autopsy photos cited by Nields. State Exhibits 3-A, 3-B and 3-C were crime scene photos, each depicting a different angle or view of the victim's body and her injuries. They illustrated the testimony of the police officers who discovered Newsome's body, and portrayed the crime scene and condition of the body. None of these photos are duplicative or cumulative. State

Exhibits 4-A and 4-E were taken at the coroner's office, and defendant did not object to them. Exhibit 4-A was repetitive of crime scene photo 3-B, but plain error is absent. Exhibit 4-E portrays the bruises on Newsome's neck and corroborated the coroner's conclusion that Newsome's death was caused by manual strangulation.

{¶ 110} Exhibits 4-C, 4-D, 4-F, and 4-G also illustrated the coroner's testimony of the victim's injuries and also showed in detail the petechiae on the victim's face and eyes. Petechiae are small, reddish marks or hemorrhages that are caused by compression around the neck. All of these photos helped to prove the killer's intent and the lack of accident or mistake. These photos also gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042, 1058. No abuse of discretion is apparent, since the probative value of each photo outweighed any prejudicial impact.

{¶ 111} Last, we find no plain error in the admission of State Exhibit 28, an enlarged photo of defendant smiling and holding a cigarette with his raised arm, that was taken shortly after his arrest. Thus, we overrule proposition XV.

*Incomplete Record*

{¶ 112} In proposition XVII, defendant asserts that the trial court erred when it failed to maintain a complete record of all proceedings as prescribed under Crim.R. 22. Defendant cites a number of pages in the transcript where off-the-record conferences were held during the course of the proceedings. However, defendant failed to object or ask for a recording of these conferences or hearings and thereby waived the issue. See *State v. Brewer* (1990), 48 Ohio St.3d 50, 60-61, 549 N.E.2d 491, 502; *State v. Grant* (1993), 67 Ohio St.3d 465, 481, 620 N.E.2d 50, 68.

{¶ 113} This court has held that "[t]he requirement of a complete, full, and unabridged transcript in capital trials does not mean that the trial record must be perfect for purposes of appellate review." *State v. Palmer* (1997), 80 Ohio St.3d 543, 687 N.E.2d 685, syllabus. Moreover, we held in *Palmer* that a reversal will not occur because of unrecorded pretrials or sidebars where the defendant has failed to request a record at trial, failed to object to the lack of a record and also failed to demonstrate that material prejudice resulted. *Id.* at 554, 687 N.E.2d at 696. See, also, *State v. Goodwin* (1999), 84 Ohio St.3d 331, 340, 703 N.E.2d 1251, 1260.

{¶ 114} Here, defendant failed to request or move for a recording of any of the off-the-record proceedings he complains of now. "[P]rejudice will not be presumed from the mere existence of * * * unrecorded bench and chambers conferences in capital cases." *Palmer*, 80 Ohio St.3d at 554, 687 N.E.2d at 697. Moreover, the context in which these conferences took place suggests that most dealt with ministerial scheduling matters such as when to break or adjourn for the day. Accordingly, we reject proposition XVII.

*Separation of Witnesses*

{¶ 115} In proposition XXXI, defendant contends that he was denied a fair trial because the state failed to comply with the trial court's order for a separation of witnesses. Defendant asserts that the state's witnesses Patricia Denier and

Barbara Beck were confronted by a friend of the victim, who told them that defendant went back to Patricia Newsome's home to "finish her off."

{¶ 116} Defendant's claim fails for several reasons. First, nothing in the record indicates that what defendant alleges took place. Second, defendant failed to object or bring the alleged matter to the trial court's attention, and therefore waived any error. *Williams,* 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. Third, defendant made no attempt to supplement the record under App.R. 9(C). *Williams*, 73 Ohio St.3d at 161, 652 N.E.2d at 729. Proposition XXXI lacks merit.

*Jailhouse Informant*

{¶ 117} In proposition XXXV, defendant submits that Hamilton County's policy of using jailhouse "snitches" to secure convictions in capital cases deprived him of his right to a fair trial and sentencing proceeding. Yet, defendant failed to raise this issue before the trial court and thereby waived all but plain error. *Williams, supra*.

{¶ 118} The testimony defendant complains about was given by Timothy Griffis, an inmate at the Hamilton County Justice Center. Nields confided details of his crime to Griffis two days after the murder. Nothing in the record suggests that Griffis was an agent of the state or that the state failed to investigate his credibility.

{¶ 119} Clearly, Griffis's credibility was a question for the trier of fact to determine. The procedural safeguard for the defense to test the reliability or credibility of Griffis's testimony was cross-examination. Moreover, Griffis's testimony was properly admitted under Evid.R. 801(D)(2)(a) as an admission by a party-opponent. We reject proposition XXXV.

*Improper Actions by Trial Court*

{¶ 120} In proposition XXXVII, defendant contends that improper actions by the trial court denied him a fair trial and sentencing proceeding. Defendant further asserts that he was denied his right to a neutral and detached judge.

{¶ 121} However, a review of the instances cited by defendant reveals that his claims are groundless. Defendant claims that the trial judge improperly restricted his right to assistance of experts. Yet, as discussed under propositions I, X, XI, XXXIII, and XXXVI, defendant never requested additional experts, and the trial court granted requests he did make for experts.

{¶ 122} Defendant next complains that the trial judge improperly placed off-the-record time limits on defense counsel's voir dire, improperly limited defense counsel's cross-examination of the jailhouse informant during the suppression hearing; and denied the vast majority of his pretrial motions. None of these complaints have merit.

{¶ 123} R.C. 2945.03 provides, "The judge of the trial court shall control all proceedings during a criminal trial, and shall limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue."

{¶ 124} Nothing in the record suggests that the trial judge abused his discretion in the various rulings he made that defendant complains about here. In addition, the time limits on voir dire are within the trial court's discretion and the record indicates that they were enforced against both sides. The limiting of cross-examination on the jailhouse informant during the suppression hearing did not constitute an abuse of discretion.

{¶ 125} Defendant also complains that the trial court prohibited his sister from testifying during the mitigation hearing about some of her contacts with Newsome and the plan to have defendant committed shortly before the murder took place. Admittedly, a defendant is accorded great latitude in the presentation of

evidence concerning mitigating factors, R.C. 2929.04(C). However, the excluded statement was not as sweeping in scope as defendant states; it merely consisted of defendant's sister testifying that "alcohol was just eating up [defendant's] brain." Arguably, defendant's sister was not competent to testify to such a matter since it could be construed as an expert opinion. In any event, defendant's expert, Dr. Cooper, did testify as to the effect alcohol had in damaging defendant's brain functioning.

{¶ 126} Defendant also complains that the judge refused to delete information from his medical records, but the court did not abuse its discretion in not doing so. Defense counsel generally requested that the trial judge delete any reference to violent or nonviolent behavior on defendant's part that appeared in his medical records. The defense failed to specifically identify what it wanted omitted. However, given the voluminous nature of the records and the prosecution's actions in refraining from highlighting anything in the medical records, any error in failing to delete any such references was harmless at worst.

{¶ 127} Last, defendant contends that the trial judge permitted the prosecution to improperly refer to two recently slain Cincinnati police officers during a final argument. Defendant never objected to these references and thus waived any error. Perhaps the prosecutor was overly dramatic in such references, but we find that this did not rise to the level of plain error. Accordingly, we reject defendant's proposition XXXVII.

SENTENCING ISSUES

*Improper Aggravating Circumstances*

{¶ 128} In proposition III, defendant asserts that victim impact evidence admitted after the jury recommended death, but before sentencing, constituted an improper aggravating circumstance considered by the court before it imposed the death sentence.

**{¶ 129}** The alleged victim impact testimony was given by friends and family of Patricia Newsome just prior to the court's sentencing verdict. At no time did defendant object to any of this testimony. Moreover, "this court will presume that the judge considered only the relevant, material, and competent evidence in arriving at a judgment, unless the contrary affirmatively appears from the record." *State v. Dennis* (1997), 79 Ohio St.3d 421, 433, 683 N.E.2d 1096, 1107, citing *State v. Post* (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.

**{¶ 130}** Similar to *Dennis*, our review of the transcript and sentencing opinion reveals no prejudice to defendant. Therefore, we overrule proposition III.

*Jury Instructions*

**{¶ 131}** In proposition XXII, defendant claims that the trial court erred and engaged in "duplicity" when it instructed the jury during the penalty phase on both the principal offender and prior calculation and design aspects of the R.C. 2929.04(A)(7) specification. Defendant argues that the jury should have been required to unanimously select only one of the alternatives.

**{¶ 132}** Defendant's failure to object to the instruction waived all but plain error. *Underwood,* 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Moreover, such an instruction is not improper if the alternatives are given to the jury disjunctively, as they were here. *State v. Cook* (1992), 65 Ohio St.3d 516, 527, 605 N.E.2d 70, 82-83; *State v. Burke* (1995), 73 Ohio St.3d 399, 405, 653 N.E.2d 242, 248; *Moore*, 81 Ohio St.3d at 40, 689 N.E.2d at 17.

**{¶ 133}** Moreover, any error was not outcome-determinative. *Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804. The evidence portrayed defendant as the principal offender, and the defense conceded that defendant was the killer. No evidence existed that suggested another offender. Thus, defendant's conviction could have been based only on his status as the principal offender. See *State v. Chinn* (1999), 85 Ohio St.3d 548, 558, 709 N.E.2d 1166, 1177. Accordingly, we reject defendant's proposition XXII.

**{¶ 134}** In proposition XL, defendant essentially alleges three instructional errors during the penalty phase: (1) charging that a life sentence recommendation must be unanimous, (2) improperly defining "reasonable doubt," and (3) giving an improper definition of "evidence."

**{¶ 135}** Yet, defendant waived these issues by not objecting to the instruction he complains of now. *Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus. Plain error is absent as well. In Ohio, it is required that a verdict of life imprisonment be unanimous, and that requirement has been upheld as constitutional. See, *e.g.*, *State v. Davis* (1991), 62 Ohio St.3d 326, 351, 581 N.E.2d 1362, 1382. In addition, the court properly instructed the jury on reasonable doubt. See *Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus. Moreover, the trial court carefully crafted the reasonable-doubt instruction for the penalty phase by eliminating references to the "truth of the charge." See, *e.g.*, *Moore,* 81 Ohio St.3d at 37, 689 N.E.2d at 16.

**{¶ 136}** Last, defendant's complaint concerning the trial court's definition of "evidence" as including "all the testimony received from the witnesses and exhibits presented in this hearing as well as all the evidence in the first hearing" is not well taken. The state moved, and the court agreed, to admit all of the evidence presented during the trial phase. Moreover, while we have held that the trial court should instruct the jury as to which relevant evidence from the trial phase it should consider, defendant waived this issue by failing to object. *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364. See, also, *Lindsey,* 87 Ohio St.3d at 484-485, 721 N.E.2d at 1003, citing *Getsy*, 84 Ohio St.3d at 201, 702 N.E.2d at 887. Therefore, we overrule proposition XL.

*Double Jeopardy*

**{¶ 137}** Defendant asserts in proposition XXIII that the court violated the Double Jeopardy Clause by sentencing him on both the felony murder charge and the aggravated robbery charge. However, this claim lacks merit since aggravated

robbery and aggravated murder based on the robbery are separate offenses. See *State v. Bickerstaff* (1984), 10 Ohio St.3d 62, 10 OBR 352, 461 N.E.2d 892, syllabus; *State v. Smith* (1997), 80 Ohio St.3d 89, 117, 684 N.E.2d 668, 693-694; and *State v. Reynolds* (1998), 80 Ohio St.3d 670, 681, 687 N.E.2d 1358, 1370-1371. Proposition XXIII is overruled.

*Disproportionate Sentencing*

{¶ 138} In proposition XXIV, defendant argues that his death sentence is excessive and disproportionate to sentences in similar cases in Hamilton County, and thus, unconstitutional.

{¶ 139} Proportionality review in this case will be undertaken as part of our independent sentence review. Defendant's other complaints lack merit. See *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; *Jenkins*, 15 Ohio St.3d at 175-176, 15 OBR at 320-321, 473 N.E.2d at 278-279, discussing *Pulley v. Harris* (1984), 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29; *Moore*, 81 Ohio St.3d at 41-42, 689 N.E.2d at 18.

*Disclosure of Brady Evidence*

{¶ 140} In proposition XXVIII, defendant claims that he was not provided access to evidence favorable to him during both phases of trial as required by *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

{¶ 141} The suppression by the prosecution of evidence favorable to an accused violates due process when the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecutor. *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, paragraph four of the syllabus, following *Brady, supra*. However, defendant utterly fails to articulate, specify or identify any exculpatory evidence that the prosecution possessed. Thus, this proposition lacks merit.

*Defendant in Shackles*

**{¶ 142}** In proposition XXX, defendant contends that he was denied a fair trial when the trial court failed to conduct a hearing or issue a curative instruction when it learned that several of the jurors saw him in shackles. This apparently occurred right before closing arguments of the mitigation phase around lunch break. Although the trial court noted this in the record, nothing more about the incident appears in the transcript.

**{¶ 143}** Defendant fails to demonstrate prejudicial error and simply asserts that he was prejudiced. However, the risk of prejudice is slight where a juror's view of a defendant in custody is brief, inadvertent, and outside the courtroom, as this apparently was. See *State v. Kidder* (1987), 32 Ohio St.3d 279, 285-286, 513 N.E.2d 311, 318; *Landrum*, 53 Ohio St.3d at 118-119, 559 N.E.2d at 724. Thus, we overrule proposition XXX.

*Juror Exposure to Media Coverage*

**{¶ 144}** In proposition XXXII, defendant asserts that he was denied a fair trial as a result of juror Patricia Getz's failure to inform the court that she had seen media coverage of the killing of two Cincinnati police officers, an incident that was referred to in the state's closing argument at the mitigation phase.

**{¶ 145}** However, nothing in the record substantiates defendant's assertion that Getz either saw certain media coverage or was influenced by any media coverage, beyond defendant's allegations. As such, this proposition is not well taken.

*Preclusion of Mitigation Evidence*

**{¶ 146}** In proposition XXXVIII, defendant argues that the trial court improperly struck from the record relevant evidence of defendant's mental state shortly before the crime was committed.

**{¶ 147}** The statement in issue was made by defendant's sister, Rochelle Pittman, during her mitigation phase testimony. Pittman related how she and

Newsome discussed their belief that defendant should be committed, and Pittman continued, stating, "I thought that it sounded like alcohol was just eating up his brain." The prosecution objected, and after a lengthy bench conference, the court announced to the jury, "For the record the objection will be sustained and I'll ask you to move on to your next question." The prosecution stated during the bench conference, and the trial court agreed, that Pittman's comment was "a backdoor way of going into mental capacity" since the parties had agreed previously that the defense would not present evidence that defendant lacked substantial mental capacity to appreciate the criminality of his conduct.

{¶ 148} R.C. 2929.04(C) provides that a defendant shall be given great latitude in presenting evidence concerning mitigating factors. As we discussed under proposition XXXVII, the statement in issue was arguably an expression of an expert opinion by a nonexpert. Yet, it would also appear that Pittman's opinion that "alcohol was just eating up his brain" was merely a personal observation that was relevant with respect to defendant's character and background.

{¶ 149} Nevertheless, defendant was not prejudiced. Defendant's expert, Dr. Emmett Cooper, essentially made the same statement when he opined that defendant had "some brain damage" as a result of his alcoholism. Therefore, we find proposition XXXVIII to be not well taken.

EFFECTIVE ASSISTANCE

{¶ 150} In propositions VI, XX, XLII, and XLIII, defendant contends that his counsel provided ineffective assistance before and during the trial. Reversal of convictions for ineffective assistance requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 151} In proposition VI, defendant claims that he was prejudiced by counsel's failure to request a crime scene investigator, an expert on voice or audio tape, and to request a mistrial due to the introduction of "prior bad acts" testimony concerning defendant. However, as we have discussed previously, the facts failed to reveal any need for a crime scene investigator or an expert on voice or audio tape. Thus, no basis exists to find deficient performance.

{¶ 152} Defendant complains that counsel failed to move for a mistrial due to the improper admission of evidence of prior bad acts, but that decision by counsel did not constitute deficient performance. The prosecutor elicited from state's witness Virginia Pangallo that defendant had once broken Newsome's nose. During a sidebar conference away from the jury, defense counsel indicated that he would not request a mistrial on that comment if the court struck Pangallo's entire testimony, except with regard to three bits of information (that she talked to Newsome on the phone on the night of the murder; that Newsome would not let others drive her Cadillac; and that Newsome carried large amounts of cash with her), none of which were facially prejudicial to defendant. The trial court then instructed the jury to disregard Pangallo's testimony except for the limited bits of information set forth above. Counsel made a tactical decision to not request a mistrial, and instead secured a curative instruction from the court for the jury to disregard Pangallo's testimony regarding prior bad acts.

{¶ 153} Defendant also contends that counsel's presentation of mitigation evidence was a "disaster" because the prosecutor was able to elicit from Dr. Cooper that defendant was "able to process rationally" at the time of the murder, and from Rochelle Pittman that Newsome had written in her diary that defendant wanted to kill both Pittman and Newsome. Admittedly, neither of these facts helped defendant, but overall, defense counsel presented substantial mitigating evidence of defendant's alcoholism and the problems he encountered throughout life as a result of alcohol. Thus, no reasonable probability exists that, in the absence of these

alleged errors, the result of the trial would have been different. *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Therefore, we overrule proposition VI.

{¶ 154} In proposition XX, defendant argues that his counsel should have filed a motion to suppress improperly suggestive identification procedures. Defendant complains that the prosecution relied heavily on the testimony of Dorothy Alvin, who encountered defendant at a bar earlier on the day of the murder, to help establish prior calculation and design. Defendant claims that counsel were ineffective because the jury never learned that Alvin "was unable to positively identify [defendant] in a photo-lineup she was given after she made her [initial] report [to police]."

{¶ 155} However, the record does not substantiate defendant's allegations concerning a photo array given to Alvin. Moreover, in previous cases, we have rejected claims of ineffective counsel when counsel failed to file or withdrew a suppression motion when doing so was a tactical decision, there was no reasonable probability of success, or there was no prejudice to the defendant. See, *e.g.*, *Allen*, 73 Ohio St.3d at 640, 653 N.E.2d at 688; *State v. Campbell* (1994), 69 Ohio St.3d 38, 44-45, 630 N.E.2d 339, 347. See, also, *Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct. 2574, 2587, 91 L.Ed.2d 305, 325, quoted in *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52, 64.

{¶ 156} In addition, defendant has not demonstrated that this alleged error affected the outcome of his trial. *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Accordingly, we reject proposition XX.

{¶ 157} In proposition XLII, defendant asserts that counsel failed to fully investigate possible mitigating factors and that counsel committed numerous errors constituting deficient performance that prejudiced him during the mitigation phase.

{¶ 158} Defendant complains that counsel failed to interview his sister (Rochelle Pittman) until the last week of trial; failed to determine if their expert,

Dr. Cooper, had prepared a written report of defendant's exam; failed to interview defendant's co-workers; and failed to obtain experts to testify during mitigation. Yet, a review of the mitigation transcript indicates that counsel presented substantial mitigation on defendant's behalf: defendant's sister testified about defendant's youth and family situation; Dr. Emmett Cooper, a psychiatrist, testified as to defendant's alcoholism and physical and mental damage resulting from it; and James Slattery, a public defender, testified as to the effects of alcoholism from the perspective of an alcoholic.

{¶ 159} On the other hand, as we noted in *State v. Hutton* (1990), 53 Ohio St.3d 36, 44, 559 N.E.2d 432, 441, "[i]t may be, for instance, that counsel conducted a diligent investigation, but was simply unable to find substantial mitigating evidence." Defendant fails to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. The record does not show counsel's thought processes, nor does it show a failure to "make reasonable investigations." *Id.* at 691, 104 S.Ct. at 2066, 80 L.Ed.2d at 695.

{¶ 160} Also, as noted earlier, the facts failed to reveal any need for a pathologist, psychologist, neuropsychologist, or pharmacologist. Thus, no basis exists to find deficient performance.

{¶ 161} Defendant also argues that counsel breached their duty during the mitigation phase by failing to object at certain times. However, counsel had no reasonable basis to object to the prosecutor stating that the aggravating circumstances need to outweigh the mitigating factors only by a "hair" or "just this much," to the comment that other alcoholics did not find themselves in defendant's position, to the comments concerning everything Newsome had done for defendant, to the instruction that a life sentence must be unanimous, to the "reasonable doubt" instruction, or to the definition of "evidence," or to references during closing argument to two slain Cincinnati police officers.

**{¶ 162}** Counsel may well have thought that objecting would unduly emphasize the prosecutor's brief remarks. *State v. Brooks* (1996), 75 Ohio St.3d 148, 158, 661 N.E.2d 1030, 1039. In addition, the jury instructions cited were properly given. Defendant again fails to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694.

**{¶ 163}** Counsel's decision not to attempt to introduce defendant's taped confession at the mitigation hearing was a tactical one. Although defendant's display of erratic, intoxicated behavior could have swayed the jury towards a life sentence, the tape could have also alienated the jury and reinforced the perception that his crime merited the death penalty. Even assuming defense counsel's tactics were questionable, we are unpersuaded that these trial tactics constituted ineffective assistance of counsel. See *State v. Clayton* (1980), 62 Ohio St.2d 45, 49, 16 O.O.3d 35, 37, 402 N.E.2d 1189, 1192.

**{¶ 164}** Defendant also complains that counsel failed to request voir dire when it was reported that jurors saw defendant in shackles, failed to work with defendant to prepare an unsworn statement, and failed to ensure a complete record of all proceedings. However, as we have found under other propositions of law, none of this was prejudicial. All decisions were reasonable tactical choices. With regard to the unsworn statement, the record indicates that defendant refused to give one, even though defense counsel discussed with him the importance of giving one. Since counsel's performance did not fall below the wide range of reasonable professional assistance during the mitigation phase, we reject proposition XLII.

**{¶ 165}** In proposition XLIII, defendant asserts that he was deprived of effective assistance of counsel during the pretrial, voir dire and the trial phases of his capital trial.

**{¶ 166}** *Pretrial.* Defendant cites counsel's lack of an objection to the court's failure to set a reasonable bond, counsel's failure to ensure a complete

record, failure to object to defects in the grand jury, and failure to obtain a pathologist and an independent psychologist. Yet, none of these alleged deficiencies demonstrate deficient performance. Also, defendant fails to demonstrate prejudice in his allegation that counsel failed to preserve a complete record. *State v. Phillips* (1995), 74 Ohio St.3d 72, 87, 656 N.E.2d 643, 659-660. Nor has defendant demonstrated how the cited experts would have significantly aided his defense. *State v. Jalowiec* (2001), 91 Ohio St.3d 220, 236, 744 N.E.2d 163, 180.

{¶ 167} *Voir Dire.* Similarly, defendant's claims of deficient performance during voir dire are not well taken. "Life qualification" of jurors is unnecessary where defense counsel, as in this case, was accorded wide latitude in detecting bias as to possible sentencing options. See *State v. Allard* (1996), 75 Ohio St.3d 482, 493, 663 N.E.2d 1277, 1288. Counsel's decision to concede that defendant killed Newsome was a tactical decision in the hope of avoiding the death penalty, since evidence of defendant's guilt was overwhelming. See *State v. Lundgren* (1995), 73 Ohio St.3d 474, 495, 653 N.E.2d 304, 324; *Goodwin*, 84 Ohio St.3d 331, 339, 703 N.E.2d 1251, 1259-1260. Counsel could have decided not to object to the prosecutor's arguing of the facts to avoid unduly emphasizing the prosecutor's points. *Brooks*, 75 Ohio St.3d at 158, 661 N.E.2d at 1039. Also, emphasis by counsel that they would not raise the defense of alcohol comported with their trial strategy to admit guilt in the hope of avoiding the death sentence during the mitigation phase.

{¶ 168} *Trial Phase.* Defendant next cites a number of incidents of alleged ineffective assistance of counsel during trial, but none of these prejudiced defendant. Counsel had no reasonable basis to object to allegations regarding a lack of remorse, to comments that the victim was a "hard working lady," to the prosecutor stating that he would argue his case with emotion and feeling, or to the instruction on reasonable doubt.

{¶ 169} As we discussed under other propositions of law, waiving the motion for a mistrial in regard to Pangallo's testimony, failing to secure a clinical pathologist, and failing to object to the inference instruction, to the instruction that allegedly failed to adequately distinguish the murder counts, to the instruction on purpose, and to the court's failure to define the theft element of the aggravated robbery charge did not prejudice defendant.

{¶ 170} Not objecting to the prosecutor's characterization of voluntary manslaughter as blaming the victim ("She made him—I had a bad day") served to avoid unduly emphasizing such a theatrical statement. See *Brooks*, 75 Ohio St.3d at 158, 661 N.E.2d at 1039. The prosecutor's references to defendant as a "mean-spirited derelict," and an "unemployed killer" represented fair comment. See *Clemons*, 82 Ohio St.3d at 451, 696 N.E.2d at 1021.

{¶ 171} The prosecutor's comment that it was humorous to him that defense counsel argued that alcohol had nothing to do with the murder but then asserted that defendant was acting in a bizarre manner and under the influence of the demons of alcohol certainly was not plain error. The prosecutor's argument that the victim would not be able to spend Christmas with loved ones was overly dramatic, but not prejudicial to defendant.

{¶ 172} In sum, none of the instances cited by defendant, either individually or collectively, determined the outcome of his trial. *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Accordingly, we overrule proposition XLIII.

PROSECUTORIAL MISCONDUCT

{¶ 173} In propositions IV, XXV, XXIX, and XLI, defendant contends that he was denied a fair trial due to prosecutorial misconduct throughout all phases of the trial. The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused.

*State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885.

{¶ 174} In proposition IV, defendant complains of comments made by the prosecutor during opening and closing statements at the trial phase, and during closing argument at the mitigation phase. Defendant first complains of comments during the trial phase when the prosecutor stated that defense attorneys sometimes make reasonable doubt appear to be "some unattainable burden * * *. Something perhaps in another galaxy." Defendant also claims error where the prosecutor stated that defendant "brutally beat and strangled a person whose only crime was trying to help him become a better person." However, defense counsel objected to both statements, and the trial court sustained the objections, ordered the comments stricken, and instructed the jury to disregard them. Given the trial court's corrective actions, prejudice to defendant is lacking. See *Frazier*, 73 Ohio St.3d at 340-341, 652 N.E.2d at 1015-1016.

{¶ 175} Defendant next cites comments by the prosecutor during closing argument of the trial phase stating that defendant was a "mean-spirited derelict" and "very lucid in fairy tales and lies and deception." He also claims error where the prosecutor told the jury that because of defendant, "Pat Newsome will not be able to huddle around a fireplace with her loved ones this Christmas," and made other references to Christmas rituals that Newsome will no longer enjoy. Defendant's failure to object to any of these comments waived all but plain error. *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916, 925. As we stated previously, the first characterization represented fair comment. However, generally referring to or alluding to a defendant as a liar is improper, in that it conveys the prosecutor's personal belief. *Clemons*, 82 Ohio St.3d at 452, 696 N.E.2d at 1021; *State v. Watson* (1991), 61 Ohio St.3d 1, 10, 572 N.E.2d 97, 106. However, the prosecutor's characterization was based on evidence presented at trial where in this case the defendant, himself, admitted to lying. *Tyler*, 50 Ohio St.3d at 41, 553

N.E.2d at 595 (a prosecutor may state a personal opinion if it is based on the evidence at trial).

{¶ 176} Defendant also complains that the prosecutor commented during mitigation-phase closing argument that Newsome "got no due process of law but just had her property taken by the defendant," and asked "how Patricia Newsome felt when she was being viciously beaten." Again, defendant's failure to object waived all but plain error. *Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d at 925. The due process comment was within the creative latitude accorded both parties. *State v. Brown* (1988), 38 Ohio St.3d 305, 317, 528 N.E.2d 523, 538. However, comments referring to what the victim was feeling or thinking may constitute error since they essentially ask the jury to speculate on facts not in evidence. *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077. However, we find that these comments were not egregious enough to deprive defendant of a fair trial. Thus, we reject proposition IV.

{¶ 177} In propositions XXV and XXIX, defendant essentially contends that he was victimized by the Hamilton County Prosecutor's Office as a result of its discriminatory charging and decision to seek the death penalty for his murder of Newsome. However, existence of discretion in the charging stage of a capital prosecution does not violate the Constitution. See, *e.g.*, *State v. Coleman* (1989), 45 Ohio St.3d 298, 308, 544 N.E.2d 622, 633-634; *Gregg v. Georgia* (1976), 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859. Propositions XXV and XXIX are not well taken.

{¶ 178} In proposition XLI, defendant cites instances of prosecutorial misconduct throughout his trial.

{¶ 179} *Voir Dire*. Defendant asserts that the prosecutor continually argued the facts of the case, thus conditioning the jury to defendant's guilt and predisposing them to impose the death sentence. Defendant submits that the prosecutor improperly commented upon the loss suffered as a result of the death of a loved one

and improperly implied that the grand jury had already found the defendant guilty of aggravated murder, thereby further implying that the petit jury's only function was to impose death. Yet, defendant's failure to object to any of these comments waived all but plain error. *Slagle*, 65 Ohio St.3d at 604, 605 N.E.2d at 925. In one instance, defense counsel did object, and the trial court sustained the objection and instructed the jury to disregard. Arguing facts in evidence is not improper, and none of the instances cited by defendant, even if assumed to be improper, actually prejudiced him. *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, 299.

{¶ 180} *Trial Phase.* Defendant next cites nine instances of alleged prosecutorial misconduct during the trial phase, many of which were waived for lack of an objection or are raised and discussed in other propositions of law below. The comment during opening statement that defendant lacked remorse was not improper since testimony conflicted on this point. The prosecutor's comment that defendant, by arguing manslaughter, was shifting blame for the murder on the victim, was overly dramatic, but within the creative latitude accorded both parties. *Brown*, 38 Ohio St.3d at 317, 528 N.E.2d at 538. The comment that Newsome was "a hard working lady, lots of friends, * * * what a dignified way to end," was harmless in that it did not prejudice defendant's right to a fair trial.

{¶ 181} The prosecutor should not have denigrated defense counsel with the following comment: "the real humorous part to me is that his attorneys on the one hand said, well, alcohol has nothing to do with it * * * then in the very next statement they say, well, he was acting strange, * * * he was under the demons of alcohol." However, it was neither outcome determinative nor unduly prejudicial. The prosecutor's comments alleged by defendant to be misstatements of law during closing argument, even if improper, were cured by the trial court. The court reminded the jury that closing arguments are not evidence and correctly instructed the jury as to the law on murder and voluntary manslaughter.

**{¶ 182}** *Mitigation Phase*. Defendant next cites eight instances of improper prosecutorial misconduct, most of which we have discussed under other propositions of law. None, however, were prejudicial. Implying that alcoholism is a voluntary condition during cross-examination of defendant's expert, who testified concerning defendant's alcoholism, was not improper. Referring during closing argument to defendant's attitude appears to be fair comment since it was based on evidence at trial. Nor was it improper for the prosecutor to point out that other alcoholics do not find themselves in defendant's position. Unobjected-to prosecutorial comments on the proper standards to be applied, even if misstated, are harmless when the trial court instructs the jury on the correct standards. See *State v. Stojetz* (1999), 84 Ohio St.3d 452, 465, 705 N.E.2d 329, 341-342, citing *State v. Greer* (1988), 39 Ohio St.3d 236, 251, 530 N.E.2d 382, 400.

**{¶ 183}** Defendant also contends that the prosecutor improperly converted mitigating factors (the nature and circumstances of the offense, and the history, character and background of defendant) into nonstatutory aggravating circumstances during closing argument. In several instances, defendant objected. The trial court cured any error by reminding the jury that the arguments of counsel are not evidence, and it was for them to determine what the evidence showed. While the prosecution did argue the nature and circumstances of the offense during closing argument, it did not suggest that these were "aggravating circumstances," an argument that would clearly violate our pronouncement in *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 662 N.E.2d 311, paragraph two of the syllabus.

**{¶ 184}** Last, the prosecutor's reference to two recently slain Cincinnati police officers was irrelevant to defendant's case and was undoubtedly a veiled appeal to the emotions of the jury. Yet, defendant's failure to object waived all but plain error. In any event, prejudice to defendant is lacking since the prosecutor couched the isolated reference to the slain police officers in terms of telling the

jurors to "follow the law." Accordingly, we find no plain error, and we overrule proposition XLI.

CONSTITUTIONALITY

{¶ 185} Defendant's argument in proposition IX that the Ohio death penalty statutes violate Article VI of the United States Constitution and various international laws can be summarily rejected. See *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484, 499; *Phillips*, 74 Ohio St.3d at 103-104, 656 N.E.2d at 671. He also waived such a challenge since he did not raise this issue before the trial court. *State v. Awan* (1986), 22 Ohio St.3d 120, 22 OBR 199, 489 N.E.2d 277, syllabus; *Williams*, 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364.

{¶ 186} In proposition XVI, defendant claims that the requirement that mitigating factors be proven by a preponderance of the evidence is unconstitutional. Yet, defendant concedes that this argument was rejected in *Jenkins*, 15 Ohio St.3d at 171-172, 15 OBR at 317, 473 N.E.2d at 275, and *Delo v. Lashley* (1993), 507 U.S. 272, 275, 113 S.Ct. 1222, 1224, 122 L.Ed.2d 620, 626.

{¶ 187} In proposition XXI, defendant argues that Ohio death penalty laws violate the state and federal Constitutions on numerous grounds. However, we summarily reject these arguments. See, *e.g., Mills*, 62 Ohio St.3d at 371-372, 582 N.E.2d at 985-986; *State v. Brooks* (1986), 25 Ohio St.3d 144, 154-155, 25 OBR 190, 199, 495 N.E.2d 407, 415-416; *State v. Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264. See, also, *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus.

*Cumulative Error (XLIV)*

{¶ 188} In his forty-fourth and final proposition of law, defendant asserts that his death sentence is inappropriate and that the combination of errors raised by him compels a reversal of his death sentence. However, defendant received a fair trial, and any error was either harmless, nonprejudicial, or curable by our independent review of sentence. "Such errors cannot become prejudicial by sheer

weight of numbers." *State v. Hill* (1996), 75 Ohio St.3d 195, 212, 661 N.E.2d 1068, 1084. Proposition XLIV is overruled.

INDEPENDENT REVIEW AND PROPORTIONALITY

*Defense Evidence*

{¶ 189} At the mitigation hearing, defendant's sister, Rochelle Pittman, testified that defendant was one of five children and that at first, they had a "fairly good family life" in Aurora, Indiana. However, after their parents were in an auto accident, their father "let some taxes slide." Later, they discovered that their father was an alcoholic, who hid bottles of liquor all over the house. The father abandoned the family in 1968 when defendant was in high school. Their mother ended up losing the family home, in part because she had never worked outside the home during her marriage. Pittman did have contact with her father twelve years later, shortly before he died of cirrhosis of the liver due to excessive alcohol consumption.

{¶ 190} One of defendant's brothers also drank heavily and was killed when his car struck a large truck. Defendant moved to California in the 1970s when he was out of school. He came back when his two brothers died, and their mother also brought defendant back home for treatment at a county hospital in the 1980s because he was "definitely drinking very hard." Defendant was hospitalized at least twice for hemorrhaging and coughing up blood as a result of his heavy drinking.

{¶ 191} Pittman conversed regularly with the victim, Patricia Newsome, and often had lunch with her. She considered Newsome a friend. According to Pittman, Newsome would try to impress upon defendant that he had to stop drinking. Defendant's relationship with Newsome was a series of break-ups and reconciliations. Not long before the murder, Newsome called Pittman and told her that defendant "was getting out of control. That he was hallucinating and was talking to people that weren't there. And that he was afraid of * * * something

chasing him." At one point, Newsome told Pittman that "he was talking to [his] dad."

{¶ 192} Around the time of defendant's March 1 domestic incident with Newsome, when police were summoned, Newsome told Pittman she wanted to have defendant committed. Newsome asked Pittman if she would have defendant committed because it would take a family member to do that. Pittman indicated that she would, but she put it off because it was close to Easter, and she was preoccupied with other matters.

{¶ 193} Pittman concluded her testimony by asking the jury to spare her brother's life. On cross-examination, Pittman learned that Newsome wrote in her diary that defendant "keeps talking about killing his sister Rochelle and killing me."

{¶ 194} Dr. Emmett Cooper, a psychiatrist who also possesses a doctorate in pharmacology, interviewed defendant after reviewing his medical records. He also interviewed defendant's sister, Rochelle. Dr. Cooper determined that defendant was an alcoholic and that he suffered from cirrhosis of the liver. He noted that on several occasions during the mid-1990s, defendant was in danger of bleeding to death and that defendant had anemia due to alcoholism and a history of seizures, which is indicative of chronic alcohol disease and withdrawal.

{¶ 195} Dr. Cooper testified that defendant's family has a history of alcoholism, including defendant's father, who died from resulting hemorrhages. Defendant began drinking when he was around twenty years old, and had a series of DUIs and alcohol treatments. According to Dr. Cooper, defendant was drinking in the range of a fifth to a fifth and one-half of vodka or its equivalent per day prior to the murder. From the time of defendant's arrest until Dr. Cooper's interview of defendant six months later, defendant enjoyed his longest period of sustained sobriety in over twenty years. Dr. Cooper further testified that lab tests indicated that defendant has "[s]ignificant liver damage, abnormal blood picture, hemorrhagic anemia, grand mal seizures, [and] gastrointestinal bleeds." Moreover,

Dr. Cooper opined that defendant endured several episodes of depression and had sustained brain damage due to his alcohol intake. During cross-examination, Dr. Cooper indicated that defendant had been divorced twice and had a grown daughter living in California.

{¶ 196} Attorney James Slattery of the Hamilton County Public Defender's Office also testified on defendant's behalf. Slattery testified as to the effects of alcoholism on himself and how it affected him as an attorney. He essentially testified that alcoholics have a very difficult time stopping drinking, even when they know that they should.

{¶ 197} Defendant did not testify or give an unsworn statement, despite defense counsel's urging him to do so. The trial judge questioned defendant directly on this, and defendant stated that he would not testify.

{¶ 198} The defense also introduced extensive medical records concerning defendant's treatments for alcohol over the years.

*Sentence Evaluation*

**{¶ 199}** After independent assessment, the evidence proves the aggravating circumstances of which defendant was convicted, *i.e.*, murder during an aggravated robbery, R.C. 2929.04(A)(7).

**{¶ 200}** As to the mitigating factors, nothing in the nature and circumstances of the offense is mitigating. However, defendant's history and background provide aspects that are worthy of weight in mitigation. Defendant's chronic problems with alcohol and the history of alcoholism in his family, including several hospitalizations for alcohol-related maladies, are mitigating.

**{¶ 201}** None of the statutory mitigating factors are really applicable here except for the R.C. 2929.04(B)(7) "catchall" factor. Defense counsel decided not to pursue the (B)(3) "mental disease or defect" factor, even though Dr. Cooper opined that defendant suffers "some brain damage." Dr. Cooper stated that he could not quantify the extent of defendant's brain damage from his examination of defendant. Based on the evidence presented at the mitigation hearing, the (B)(3) factor was not established. However, Dr. Cooper's findings should be given weight as a (B)(7) "other factor."

**{¶ 202}** We find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. The death sentence is appropriate under all the facts and circumstances of this case. The manual strangulation of Patricia Newsome and defendant's comments to friends at the bar that they would be reading about "it" (the murder) in the next day's newspaper, a clear recollection of what he had done and how, and his apparent lack of intoxication right after the murder, indicate that defendant was aware of the gravity and consequences of his actions, notwithstanding his alcoholism and even assuming he had been drinking before the murder.

**{¶ 203}** The death sentence imposed in this case is neither excessive nor disproportionate when compared with similar cases of murder involving aggravated

robbery. See, *e.g., State v. Eley* (1996), 77 Ohio St.3d 174, 672 N.E.2d 640; *State v. Raglin* (1998), 83 Ohio St.3d 253, 699 N.E.2d 482.

{¶ 204} Therefore, we affirm defendant's convictions and sentences, including the death sentence.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur.

COOK, J., concurs in judgment only.

PFEIFER, J., dissents.

_____

**PFEIFER, J., dissenting.**

{¶ 205} I dissent from the majority's imposition of the death penalty. As I stated in my dissent in *State v. Simko* (1994), 71 Ohio St.3d 483, 501-502, 644 N.E.2d 345, 359-360, the General Assembly has granted this court an imprecise mandate regarding our proportionality review in death penalty cases. I view our role pursuant to R.C. 2929.05 as determining "whether the penalty of death is appropriate in a particular case, given the penalty's role in our overall system of justice." *Simko* at 502, 644 N.E.2d at 360. I do not believe that Nields's is the type of crime that the General Assembly did contemplate or should have contemplated as a death penalty offense.

{¶ 206} The jury determined that the elements justifying an imposition of the death penalty were present in this case. However, this court's responsibility to undertake proportionality review requires us to depart from the "checklist" approach in order to seriously review whether the crime committed merits the ultimate penalty. While Nields took some traveler's checks and drove off in the victim's car, thereby satisfying the requisite robbery element for a death penalty offense, this case is not about robbery. It is about alcoholism, rage, and rejection— and about Nields's inability to cope with any of them. It is a crime of passion

imbued with pathos and reeking of alcohol. It is also a crime that is all too common, but in stealing some traveler's checks, Nields bought himself a death sentence.

{¶ 207} This court needs to be less clinical and more reflective in determining whether cases like this fit within the death penalty scheme. Prosecutors also must be called upon to use their discretion more thoughtfully. Prosecutors should be exercising their discretion to look for reasons to spare persons from the death penalty rather than to look for ways to shoehorn cases into the death penalty scheme. I believe that Ohioans thirst for justice, not blood.

APPENDIX

{¶ 208} "Proposition of Law No. I: The defendant-appellant was prejudiced by a lack of funds to adequately defend himself in this litigation. As a result, Nields was deprived of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 209} "Proposition of Law No. II: Misconduct by the state's attorneys in impermissibly introducing prior bad acts testimony violates a defendant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 210} "Proposition of Law No. III: Where, in a capital case, the sentencing court considers and weighs invalid or improper aggravating factors in imposing the death sentence, that sentence violates the Eighth Amendment to the Constitution of the United States, and the right to due process under the Fourteenth Amendment of the United States Constitution.

{¶ 211} "Proposition of Law No. IV: Egregious misconduct by the prosecutor in opening statement, closing argument and argument in the penalty phase of the proceedings was prejudicial as to deny defendant a fair trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 212} "Proposition of Law No. V: Defendant-appellant was denied his rights of due process as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution as the trial court failed to provide required jury instructions.

{¶ 213} "Proposition of Law No. VI: Defendant-appellant was denied his rights to due process as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Sections Ten and Sixteen of the Ohio Constitution as he received ineffective assistance of counsel.

{¶ 214} "Proposition of Law No. VII: The trial court erred in failing to suppress Nields' statement to the police and the search of his home violated his rights under the Fourth and Fifth Amendment to the United States Constitution, and Article I, Sections Ten and Fourteen of the Ohio Constitution.

{¶ 215} "Proposition of Law No. VIII: The judgment of conviction on the aggravated murder counts is unsupported by legally sufficient evidence and is contrary to the manifest weight of the evidence, and as a result, appellant's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated. (Argued Together)

{¶ 216} "Proposition of Law No. IX: The trial court erred when it failed to rule that Ohio's death penalty statute violated various international laws and treaties entered into by the United States Senate.

{¶ 217} "Proposition of Law No. X: The trial court failed to provide appellant Nields with an independent expert pathologist to assist appellant in both the innocence/guilt and mitigation phases of his capital trial.

{¶ 218} "Proposition of Law No. XI: The trial court's failure to appoint an independent neuropharmacologist deprived appellant Nields of his statutory rights as well as his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 219} "Proposition of Law No. XII:  Appellant was denied reasonable bond in violation of his rights under the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 9, of the Ohio Constitution.

{¶ 220} "Proposition of Law No. XIII:  Appellant's indictment was returned by an improperly constituted grand jury and upon inadequately presented evidence in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

{¶ 221} "Proposition of Law No. XIV:  The prejudicial publicity, which occurred throughout appellant Nields' trial, deprived him of his right to a fair trial and a fair and reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 222} "Proposition of Law No. XV:  The admission of gruesome and otherwise prejudicial photographs which were cumulative of each other as well as other evidence violated appellant Nields' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 223} "Proposition of Law No. XVI:  Requiring that mitigating factors be proven by a preponderance of the evidence violates the Eighth, Ninth, and Fourteenth Amendments to the United States Constitution.

{¶ 224} "Proposition of Law No. XVII:  The trial court erred when it failed to maintain a complete record of all proceedings in appellant Nields' capital trial.

{¶ 225} "Proposition of Law No. XVIII:  The trial court's application of Ohio's statutory definition of reasonable doubt in the mitigation phase of appellant's capital trial deprived him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 226} "Proposition of Law No. XIX:  The evidence the state obtained in its searches of Nields' person, vehicle, and residence, both on the night of his arrest and the following week, were the fruits of illegal searches and seizures, and

deprived appellant of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 227} "Proposition of Law No. XX: Improperly suggestive identification lineups deprived appellant Nields of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 228} "Proposition of Law No. XXI: Ohio's death penalty law is unconstitutional. The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and §§ 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Rev.Code §§ 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Richard Nields.

{¶ 229} "Proposition of Law No. XXII: The trial court erred by allowing Mr. Nields to be tried, convicted, and sentenced to death on an indictment which charged Mr. Nields with an aggravated robbery specification based on the accusation that he was 'the principal offender' and/or committed the aggravated murder 'with prior calculation and design,' in violation of the prohibition against duplicitous indictments, and deprived Mr. Nields of his rights to a unanimous verdict, as well as substantive and procedural due process as guaranteed by the Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, Article I, Sections 1, 2, 9, 10, 16 and 20 of the Ohio Constitution.

{¶ 230} "Proposition of Law No. XXIII: The trial court erred by simultaneously sentencing Mr. Nields both on the charge of felony murder and on the same substantive underlying felony charge in violation of the Double Jeopardy Clause of the United States Constitution.

{¶ 231} "Proposition of Law No. XXIV: Appellant's death sentence is excessive and disproportionate to sentences in similar cases, thereby depriving Mr. Nields of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to

the United States Constitution, as well as Sections 9 and 16, Article I of the Ohio Constitution.

{¶ 232} "Proposition of Law No. XXV:  Prosecutor's [*sic*] have unregulated discretion in determining who will be charged with the death penalty. The discriminatory charging and prosecution actions of the Hamilton County Prosecutor's Office in appellant Nields' case deprived him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 233} "Proposition of Law No. XXVI:  Appellant Nields was denied his right to a fair trial by an impartial jury in his capital case as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution when the trial court failed to excuse for cause jurors whose statements during voir dire indicated that they could not be fair and impartial.

{¶ 234} "Proposition of Law No. XXVII:  Appellant Nields' rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated by the improper excusal of prospective jurors.

{¶ 235} "Proposition of Law No. XXVIII:  The state's failure to provide access and failing to disclose to trial counsel information material to both the trial and sentencing phases of Mr. Nields' capital trial deprived him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 236} "Proposition of Law No. XXIX:  The discriminatory charging and prosecution actions of the Hamilton County Prosecutor's Office in appellant Nields' case deprived him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

{¶ 237} "Proposition of Law No. XXX:  The trial court's failure to conduct a hearing or provide a curative instruction to the jury after it discovered that jurors had witnessed appellant being escorted by jail guards in shackles deprived appellant

of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 238}** "Proposition of Law No. XXXI: The state's failure to ensure that its witnesses remained separated throughout appellant's capital trial deprived Mr. Nields of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 239}** "Proposition of Law No. XXXII: A juror's failure to notify the trial court, prior to the mitigation hearing, that she had been influenced by media coverage seen the day the guilty verdict was returned deprived Mr. Nields of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 240}** "Proposition of Law No. XXXIII: The trial court's failure to appoint an independent psychologist deprived appellant Nields of his statutory rights as well as his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 241}** "Proposition of Law No. XXXIV: The process used to select the foremen of grand juries which return capital indictments in Hamilton County is biased. As a result, appellant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated.

**{¶ 242}** "Proposition of Law No. XXXV: The state's use of a jailhouse informant to secure Mr. Nields' conviction deprived appellant of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 243}** "Proposition of Law No. XXXVI: The trial court's failure to appoint an independent neuropsychologist deprived appellant Nields of his statutory rights as well as his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 244}** "Proposition of Law No. XXXVII: Mr. Nields was denied his right to a neutral and detached judge in his capital trial and sentencing proceedings in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 245}** "Proposition of Law No. XXXVIII: The preclusion of mitigation evidence at appellant's sentencing hearing deprived Mr. Nields of his right to a reliable sentencing determination by an informed jury as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 246}** "Proposition of Law No. XXXIX: The trial court committed numerous errors in instructing the jury in the guilt determination phase of appellant Nields' capital trial in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. As a result, appellant's convictions and death sentence are constitutionally infirm.

**{¶ 247}** "Proposition of Law No. XL: Erroneous instructions at the penalty phase of his capital trial violated appellant Nields' rights of due process and a fair and reliable determination of the appropriate sentence as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 248}** "Proposition of Law No. XLI: Erroneous instructions at the penalty phase of his capital trial violated appellant Nields' rights of due process and a fair and reliable determination of the appropriate sentence as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 249}** "Proposition of Law No. XLII: Mr. Nields was deprived of his right to the effective assistance of counsel in the mitigation phase of his capital trial.

**{¶ 250}** "Proposition of Law No. XLIII: Mr. Nields was deprived of his right to the effective assistance of counsel in the innocence/guilt determination phase of his capital trial.

{¶ 251} "Proposition of Law No. XLIV:  Appellant Nields' death sentence is unreliable, inappropriate, and violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution."

———————————

*Michael K. Allen*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker,* State Public Defender, and *William S. Lazarow,* Assistant Public Defender; *Faulkner & Tepe* and *A. Norman Aubin*, for appellant.

———————————