JOURNAL ENTRY AND OPINION.
{¶ 1} Defendant-appellant Gerald Thompson appeals his convictions for aggravated murder, abuse of a corpse, and domestic violence, entered after a jury trial. We find merit to the appeal in part and vacate Thompson's sentence and remand for resentencing.
 {¶ 2} Thompson was charged in a three-count indictment for the murder of Nancy Pimentel and his attempt to destroy her body. He was charged with aggravated murder, abuse of a corpse, and domestic violence. The following evidence was presented at trial.
 {¶ 3} Thompson met the victim at a boarding house in Vancouver, British Columbia in late December 2000 or early January 2001. In April 2001, they moved to an apartment at the Gates Mills Towers in Mayfield Heights, Ohio.
 {¶ 4} Eulace Fox testified that he worked in the apartment's maintenance office. On June 2, 2001, he received a complaint from a tenant residing in the unit below Thompson's apartment that water was leaking from their living room and dining room ceilings. Fox, accompanied by his supervisor, knocked on Thompson's apartment door to investigate the problem. Thompson answered the door but initially refused to allow them to enter. When they informed him that they had a pass key, he let them in.
 {¶ 5} Upon entering the apartment, they observed a great deal of water on the living room carpet and kitchen floor and clothes soaking in the sink. After finding no leak in the kitchen, the two men asked to check the bathroom. Thompson, however, nervously told them they could not go in the bathroom because it was occupied. Thompson acted "strange" while the men were in the apartment and followed closely behind them.
 {¶ 6} Both men testified that they noticed a large hole in the dining room wall about five feet from the floor. When Fox looked into the hole, he saw a clump of hair. Thompson assured the men that he would repair the wall.
 {¶ 7} David Stasieko, a plumbing service technician, testified that on June 8, 2001, he observed Thompson going in and out of his apartment, looking "fidgety and nervous." He asked him if he needed assistance, but Thompson told him everything was fine.
 {¶ 8} On June 10, 2001, Tony Mack, a service technician supervisor, received a call from the tenant in the unit below Thompson's apartment complaining that something was leaking from the balcony above his balcony. When Thompson did not respond to Mack's knock on the door, he went to the apartment above Thompson's and looked down toward Thompson's balcony, where he saw a garbage can. Mack then obtained a pass key and entered Thompson's apartment. He noticed the apartment was partially empty and saw bleach stains on newly installed carpeting. He discovered a body inside the garbage can and called the police.
 {¶ 9} The coroner's office determined that the body had been immersed in acid and was partially decomposed. It had been chopped into various parts and decapitated. Comparisons of dental records and DNA confirmed it was Pimentel's body. According to the coroner, the body had been in the garbage can anywhere from a few days to several weeks.
 {¶ 10} The coroner stated that Pimentel's body had at least 40 bruises from blunt force blows of an overlapping nature, indicating that a prolonged struggle had occurred. Although the body had nine recently fractured ribs, the ribs also showed signs of having been previously fractured. The coroner concluded that the cause of Pimentel's death was multiple blunt impacts to the head, trunk, and extremities, with skeletal and visceral injuries. DNA analysis of bloodstains in the living room, in the hallway, and on the bathroom ceiling all matched Pimentel's DNA.
 {¶ 11} Pimentel's sister testified that the victim told her in March 2001 that Thompson had broken her ribs, and a Canadian police officer verified that Thompson had been charged with domestic violence in March 2001 and deported from Canada.
 {¶ 12} Danielle Previte testified that she met Thompson in May 2001 and they smoked a marijuana joint together in the parking garage of the apartment complex. Thompson told her that his girlfriend would not approve of his bringing another woman home, so he could not take her to his apartment. She stated that on May 31, 2001, Thompson invited her to go out west with him because he was tired of being with his girlfriend. She refused and never heard from him again.
 {¶ 13} Officer Bruhn of the Arizona Highway Patrol testified that, on June 16, 2001, he was patrolling Interstate 19, which runs from Tucson to the Mexican border, when he pulled over a maroon van, seventeen miles from the border. After learning Thompson's identity and discovering an outstanding arrest warrant, he arrested Thompson.
 {¶ 14} Detectives ran various computer searches and determined that the garbage can and acid were purchased at a Home Depot store in Highland Heights on June 4, 2001 at approximately 2:29 p.m. The security videotape of the purchase revealed a man purchased the items, but his identity was not discernable because of the poor quality of the tape. Still photographs were enlarged from the tape and other photographs of Thompson were also obtained.
 {¶ 15} Detectives questioned Stephanie Griffin, the Home Depot cashier who sold the items. The interview took place approximately two weeks after the purchase. Griffin recalled the purchase because she told the customer that the store had cheaper garbage cans and she noticed the unusually large amount of acid that he purchased. Griffin also recalled that when the customer dropped his receipt, she attempted to give it back to him, and he told her, "No, baby. I don't need that."
 {¶ 16} Griffin could not identify Thompson from the videotape or still photos from the tape due to their poor quality. However, when shown a different photo, she was able to identify Thompson after she covered the lower half of the photo and focused solely on his eyes.
 {¶ 17} Thompson testified on his own behalf, against the advice of his counsel. He admitted to having prior convictions for rape, possession of drugs, fraud, driving under the influence, and domestic violence. He denied killing Pimentel or abusing her corpse, and he denied physically abusing her in the past. He explained that the hole in the dining room wall was caused by Pimentel engaging in "bumping" with clients involved in her aromatherapy business.
 {¶ 18} Thompson denied being in town on the date the items were purchased from the Home Depot store, claiming he was either in Pittsburgh or Missouri engaging in a credit card scam. Thompson claimed that several people in the building did not approve of his dating a white woman and perhaps one of them attacked Pimentel.
 {¶ 19} Based on the above evidence, the jury found Thompson guilty. He was sentenced to twenty years to life for aggravated murder, one year for abuse of a corpse, to run consecutive to the aggravated murder charge, and six months for domestic violence, to run concurrent with the aggravated murder charge.
 {¶ 20} Thompson raises seven assignments of error.
 Other Acts Evidence {¶ 21} In his first assignment of error, Thompson argues that the trial court erred by permitting evidence of prior bad acts in contravention of Evid.R. 404(B). The prior bad acts consisted of Thompson's prior domestic violence against Pimentel and the various aliases he used.
 {¶ 22} The admissibility of "other acts" evidence is within the sound discretion of the trial court. State v. Matthews (1992),80 Ohio App.3d 409, 415. A reviewing court should reverse a trial court's evidentiary ruling only on an abuse of discretion that amounts to prejudicial error. State v. Graham (1979), 58 Ohio St.2d 350, 352.
 {¶ 23} Evid.R. 404(B) provides:
"(B) Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
 {¶ 24} The Ohio Supreme Court has held that evidence of domestic violence proving a "strained relationship" between the defendant and victim is admissible in a murder case to show motive, intent, and absence of mistake. State v. Nields (2001), 93 Ohio St.3d 6. Moreover, many courts have allowed the admission of domestic violence evidence to prove identity when the defendant denies being the perpetrator of the crime, thereby making identity a material issue, and when the domestic violence is temporally connected to the alleged crime. See, e.g., State v.Griffin, Hamilton App. No. 020084, 2003-Ohio-3196; State v. Newcomb, Logan App. No. 8-01-07, 2001-Ohio-2325, appeal not allowed,94 Ohio St.3d 1489.
 {¶ 25} Testimony by an officer from Winnipeg, Canada indicated that on March 27, 2001, Thompson was arrested for beating Pimentel in a hotel parking lot, breaking several of her ribs. Pimentel's sister also testified that Pimentel told her that Thompson was in jail for breaking her ribs. The State argued that the evidence was probative as to motive and intent based on Thompson's abusive relationship with Pimentel and his desire to avoid jail time for another domestic violence offense.
 {¶ 26} Consistent with the holding in Nields and Evid.R. 404(B), the trial court properly allowed this evidence to show the defendant's motive and intent. Although we disagree with the State's argument that the prior domestic violence charge supplied the motivation for Thompson to kill Pimentel in order to avoid going to jail, we find that the domestic violence charge is evidence of motive and intent based on the abusive relationship.
 {¶ 27} Moreover, the trial court properly admitted the evidence because it was probative of the perpetrator's identity. Thompson placed his identity at issue by denying he committed the murder and furthermore, placing blame on someone in his apartment building. Evidence of prior domestic violence was relevant to rebut Thompson's claim that he did not hit Pimentel in the past and to prove that Thompson, rather than a person in the apartment building, was capable of inflicting serious injury to Pimentel. Likewise, the domestic violence incident occurred within close proximity to the time of the murder.
 {¶ 28} Testimony regarding the fact that Thompson had multiple aliases was also admitted. We find that this evidence had nothing to do with Thompson's motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake regarding the charges in the instant case. But despite its improper allowance by the trial court, we find its admission was harmless error.
 {¶ 29} Pursuant to Crim.R. 52(A), "any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." In order to find an error harmless, a reviewing court must be able to declare a belief that the error was harmless beyond a reasonable doubt. State v. Lytle (1976), 48 Ohio St.2d 391, 403. A reviewing court may overlook an error where the admissible evidence comprises "overwhelming" proof of a defendant's guilt. State v. Williams
(1983), 6 Ohio St.3d 281, 290. "Where there is no reasonable possibility that unlawful testimony contributed to a conviction, the error is harmless and therefore will not be grounds for reversal." State v. Brown
(1992), 65 Ohio St.3d 483, 485.
 {¶ 30} In the instant case, there was overwhelming proof of Thompson's guilt notwithstanding the inadmissible testimony. Thompson lived with the victim in the apartment where the body was found. The Home Depot cashier testified that Thompson purchased one garbage can along with nine gallons of muriatic acid, the same items used in an attempt to dispose of the body. The maintenance workers testified to Thompson's appearing nervous when they investigated water leaking into the apartment below, and he was seen by others acting suspiciously. Furthermore, he was apprehended just seventeen miles from the Mexican border approximately one week after the victim's body was discovered.
 {¶ 31} In light of the overwhelming circumstantial evidence against Thompson, we find that there was no reasonable possibility that the testimony about his aliases contributed to the conviction.
 {¶ 32} Thompson's first assignment of error is overruled.
 Insufficient Evidence {¶ 33} In his second assignment of error, Thompson argues that his convictions for aggravated murder and domestic violence were not supported by sufficient evidence because there was no direct evidence linking him to the crimes.
 {¶ 34} As stated in the first assignment of error, there was overwhelming evidence of Thompson's guilt. Although it was circumstantial evidence, circumstantial and direct evidence are of equal evidentiary value. See, State v. Jenks (1991), 61 Ohio St.3d 259, 272 (circumstantial evidence and direct evidence inherently possess the same probative value and in some instances certain facts can only be established by circumstantial evidence).
 {¶ 35} Thompson's second assignment of error is overruled.
 Suggestive Identification Procedure {¶ 36} In his third assignment of error, Thompson argues that the store cashier's identification was tainted because the police showed her an eight-by-twelve photograph of Thompson after she watched the store's videotape.
 {¶ 37} Reliability is the basis for determining whether identification evidence is admissible. Manson v. Brathwaite (1977),432 U.S. 98, 114. The United States Supreme Court has set forth five factors to be considered in evaluating reliability as follows:
 {¶ 38} "* * * The opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.* * *"
Neil v. Biggers (1972), 409 U.S. 188, 199-200; see, also, State v.Jells (1990), 53 Ohio St.3d 22, 27.
 {¶ 39} Before determining reliability pursuant to Neil v.Biggers, supra, the court must first determine if the identification procedures used were impermissibly suggestive. State v. Merrill (1984),22 Ohio App.3d 119, 122. The defendant has the burden to show the court that the identification procedures were unnecessarily suggestive. Statev. Sims (1984), 13 Ohio App.3d 287, 288. Moreover, even suggestive identification procedures do not preclude admission where the identification itself is determined to be reliable. State v. Moody
(1978), 55 Ohio St.2d 64, 67.
"The focus, under the `totality of the circumstances' approach, is uponthe reliability of the identification, not the identificationprocedures. State v. Lott (1990), 51 Ohio St.3d 160, 175, 555 N.E.2d 293,308; Manson v. Brathwaite (1977), 432 U.S. 98, 114, 53 L.Ed.2d 140,97 S.Ct. 2243. (`* * * reliability is the linchpin in determining theadmissibility of identification testimony * * *.') * * *" State v.Jells, supra, at 27.
 {¶ 40} It is undisputed that the cashier was shown photos only of Thompson. However, she was shown the photos in order to recall a purchase transaction, not to identify a suspect in a crime she witnessed. Although she did not recognize Thompson from the videotape or the still photos made from the tape due to problems with clarity, she did recognize him from another photo once she covered the lower part of his face. She testified that she recognized his eyes and that he had a thinner beard at the time of the transaction.
 {¶ 41} The cashier also testified that at the time of the purchase, she recalled telling Thompson that the store had cheaper garbage cans than the one he had chosen and that he went and got a cheaper one. She also stated that she remembered the transaction well because Thompson was buying an unusually large quantity of acid. When Thompson dropped his receipt, she recalled handing it to him and he replied, "No, baby. I don't need that."
 {¶ 42} She was shown the photos approximately two weeks after the transaction and testified that she was approximately one to three feet from Thompson during the entire one-to-two-minute transaction.
 {¶ 43} Based on the cashier's recollection of events, her close proximity to Thompson during the transaction, and the fact that the identification was made only two weeks later, her identification of Thompson was reliable. Accordingly, the trial court did not err in permitting the identification testimony.
 {¶ 44} Thompson's third assignment of error is overruled.
 Jury Instruction {¶ 45} In his fourth assignment of error, Thompson argues that the trial court erred by not instructing the jury on the lesser included offense of involuntary manslaughter.
 {¶ 46} In State v. Davis (1983), 6 Ohio St.3d 91, 95, the Ohio Supreme Court held:
"* * * merely because one offense can be a lesser included offense ofanother does not mean that a court must always instruct on both offenseswhere the greater offense is charged. * * * The persuasiveness of theevidence regarding [**14] the lesser included offense is irrelevant. Ifunder any reasonable view of the evidence it is possible for the trier offact to find the defendant not guilty of the greater offense and guiltyof the lesser offense, the instruction on the lesser included offensemust be given. The evidence must be considered in the light mostfavorable to defendant."
 {¶ 47} Involuntary manslaughter is a lesser included offense of aggravated murder. State v. Thomas (1988), 40 Ohio St.3d 213, paragraph one of the syllabus. The difference between the two offenses is that aggravated murder requires a purpose to kill, while involuntary manslaughter requires only that a killing occurred as a proximate result of committing or attempting to commit a felony. State v. Jenkins (1984),15 Ohio St.3d 164, 218.
 {¶ 48} The evidence in the instant case indicated that Pimentel's body had 40 overlapping bruises and nine recently fractured ribs. This evidence hardly supports an involuntary manslaughter charge. The trial court, therefore, did not err in refusing to give the instruction.
 {¶ 49} Thompson's fourth assignment of error is overruled.
 Gruesome Photographs {¶ 50} In his fifth assignment of error, Thompson argues that the trial court erred by allowing the State to introduce gruesome photographs of Pimentel's body.
 {¶ 51} As the Ohio Supreme Court held in State v. Maurer (1984),15 Ohio St.3d 239:
"Evid. R. 403 and 611(A), the admission of photographs is left to thesound discretion of the trial court. See State v. Wilson (1972),30 Ohio St.2d 199, 203-204 [59 O.O.2d 220, 283 N.E.2d 632] (autopsyphotos). To be certain, a trial court may reject a photograph, otherwiseadmissible, due to its inflammatory nature if on balance the prejudiceoutweighs the relative probative value. However, the mere fact that aphotograph is gruesome or horrendous is not sufficient to render it per seinadmissible. State v. Woodards (1966), 6 Ohio St.2d 14, 25[35 O.O.2d 8, 215 N.E.2d 568]. `The trial court has broad discretion in theadmission * * * of evidence and unless it had clearly abused itsdiscretion and the defendant has been materially prejudiced thereby, thiscourt should be slow to interfere.' State v. Hymore (1967),9 Ohio St.2d 122, 128 [38 O.O.2d 298, 224 N.E.2d 126]."
Id. at 264.
 {¶ 52} While the photographs in the instant case admittedly are gruesome, they are probative of issues and testimony presented at trial. Photos of parts of the victim's body were probative to illustrate the testimony of the forensic experts regarding the severity of the blows to the victim and how the cause of death was determined.
 {¶ 53} Moreover, Thompson was also charged with abuse of a corpse, and the photographs were clearly relevant to that charge.
 {¶ 54} Thompson's fifth assignment of error is overruled.
 Written Jury Instructions {¶ 55} In his sixth assignment of error, Thompson argues that the trial court erred by not including in the record the written instructions the court submitted to the jury for use during deliberations.
 {¶ 56} R.C. 2945.10 provides that written jury instructions should be preserved as part of the record. However, failure to do so does not automatically constitute reversible error. In State v. Mills (Dec. 9, 1999), Cuyahoga App. No. 74700, this court held that the absence of the court's written jury instructions from the record is not reversible error where both the State and the defense had the opportunity to review the court's proposed written instructions and neither party identified an error in the written instructions, nor alleged a variation between the court's verbal instructions and the written instructions that had been reviewed previously.
 {¶ 57} Furthermore, the burden is on the defendant to show that any error in failing to preserve written instructions resulted in prejudice. State v. Warner (1990), 55 Ohio St.3d 31, fn. 19; State v.Cruz (Jan. 27, 2000), Cuyahoga App. No. 75723. Thompson has failed to make any showing that the trial court's failure to preserve the written instructions prejudiced him.
 {¶ 58} Thompson's sixth assignment of error is overruled.
 Consecutive Sentences {¶ 59} In his seventh assignment of error, Thompson argues that the
 {¶ 60} the trial court erred in running his sentence for abuse of a corpse consecutive to his aggravated murder conviction without giving adequate reasons for imposing the sentence, and for imposing the maximum sentence for abusing a corpse without making the required findings.
 {¶ 61} In imposing consecutive prison terms for convictions of multiple offenses, the trial court must make certain findings enumerated in R.C. 2929.14(E)(4). According to this statute, a court may impose consecutive sentences only when it concludes that the sentence is (1) necessary to protect the public from future crime or to punish the offender; (2) not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; and (3) the court finds one of the following: (a) the crimes were committed while awaiting trial or sentencing, under sanction or under post-release control; (b) the harm caused by multiple offenses was so great or unusual that a single prison term would not adequately reflect the seriousness of the offense; or (c) the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime. R.C. 2929.14(E).
 {¶ 62} When the trial court makes the above findings, it must also state its reasons on the record. State v. Gray (Feb. 22, 2001), Cuyahoga App. No. 77849.
 {¶ 63} In the instant case, the trial court stated in imposing consecutive sentences that:
"[C]onsecutive sentences are necessary to protect the public and punishthe offender. And the defendant's criminal history indicates the need toprotect the public from this predator.Accordingly, it is the sentence ofthis Court, with respect to Count 2, that the Defendant be incarceratedin Lorain Correctional Institution for a period of one year plus there isa possibility of three years post release control. Sentence to be servedconsecutive to Count 1." (Tr. 1582-1583).
 {¶ 64} The trial court failed to state that a consecutive sentence "was not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public" as required pursuant to R.C. 2929.14(E)(2). The trial court also failed to give its reasons in support of its finding a consecutive sentence was necessary.
 {¶ 65} Likewise, when imposing the maximum sentence for an offense, the sentencing court is required to make a finding that the offender fits within one of the categories listed in R.C 2929.14(C). The trial court, according to R.C. 2929.19(B)(2)(d), must also state its reasons that support its finding. State v. Parker (2001),144 Ohio App.3d 334. The trial court failed to make the required findings and to state its reasons in imposing the maximum sentence for abuse of a corpse.
 {¶ 66} Accordingly, this assignment of error has merit.
ANN DYKE, P.J. and SEAN C. GALLAGHER, J. CONCUR